Assigned to:
JUDGE J. DOUGLAS KNIGHT

VANDERBURGH SUPERIOR COURT
★  FILED  ★

AUG 2 1 2008

Susan R. Kirk
CLERK

Alan R. Brill
420 NW Fifth Street
Evansville, IN 47708
Telephone: (812) 423-6200
Facsimile: (812) 428-4021

STATE OF INDIANA

COUNTY OF VANDERBURGH

) SS: IN THE VANDERBURGH SUPERIOR COURT
)
)
)
) CAUSE NO. 82 D030808 PL 4636

| | |
|---|---|
| Alan R. Brill; Business Management Consultants, LP (fka Brill Media Company, LP; ARB Finance-One, Inc. (now known as Nexus Systems, Inc.; Plaintiff ARB Finance-Two, Inc.; BEL, LLC; BH One, LLC; BH Two, LLC; Brill Media Company, Inc. (now known as Business Management Holdings, Inc.); Brill Media Holdings, LLC.; Broadcasting, Inc.; Central Michigan Directories, Inc.; CI, LLC; C.M. Realty, Inc.; CMR Investments, LP; DRI, LLC; DRII, LLC; ERC I, LLC; ERC II, LLC; Huron Holdings, Inc.; Huron Management, Inc.; Lancaster-York Broadcasting, LLC; Lancaster-York Broadcasting Management, Inc.; Lancaster-York Holdings, LLC; Lancaster-York Holdings Management, Inc.; Learning Research, Inc.; Northern Holdings, Inc.; Northern Colorado Management, Inc.; Northland Holdings, Inc.; Northland Management, Inc.; Northwest Radio, Inc.; Outdoor Advertising, LLC; Pontiac Newspapers, Inc.; Promotion Publications, Inc. (now known as TC2, Inc.); Sign Easy, Inc.; Tower Company, Inc.; TSB II, Inc.; TSB III, LLC; TSB III Management, Inc.; Tri-State Holdings, LLC.; Tri-State Holdings Management, Inc.; WRM, LLC. (now known as Nexus Services, LLC); WYM, LLC; and Doe 1 through Doe 50, inclusive,<br><br>Plaintiffs,<br><br>vs.. | **COMPLAINT**<br><br>Breach of Written Contract -- First Regent Confidentiality Contract)<br>(Against Regent, Jacobs and Agents)<br><br>(Breach of Written Contract -- Second Regent Confidentiality Contract)<br>(Against Regent, Jacobs and Agents<br><br>(Breach of Oral Promises -- Oral Partnering Promises)<br>(Against Regent, Jacobs and Agents)<br><br>(Breach of Implied Covenants of Good Faith and Fair Dealing in Contracts, Written and Oral)<br>(Against Regent, Jacobs and Agents)<br><br>(Fraud and Misrepresentation  -- Partnering Relationship with Brill)<br>(Against Regent, Jacobs and Agents)<br><br>(Breach of Implied Covenants of Good Faith and Fair Dealing in Promises, Written and Oral)<br>(Against Regent, Jacobs and Agents)<br><br>(Intentional Interference with Contract -- Alan Brill Parties/Brill Bankruptcy Estate)<br>(Against Regent, Jacobs and Agents, Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward) |

39728

i

*, 0H on 124*

Regent Communications, Inc.; Terry S.
Jacobs; Anthony H N Schnelling, Esq.;
Bridge Associates, LLC; H. Slayton Dabney,
Jr., Esq.; John W. Ames, Esq.; Greenebaum
Doll & McDonald PLLC; Nicholas W. Tell;*cA*
Jr. Esq.; TCW Group, Inc.; AIG SunAmerica,
Inc.; Shared Opportunity Fund IIB, L.L.C.;
TCW Shared Opportunity Fund III, L.P.;
TCW Leveraged Income Trust, L.P.; TCW
Leveraged Income Trust II, L.P.; TCW
LINC III CBO, Ltd.; TCW Leveraged
Income Trust IV, L.P.; TCW (SHOP III)
L.P.; TCW Advisers (Bermuda), Ltd.;
TCW (LINC II), L.P., TCW (LINC IV)
L.L.C.; TCW Asset Management Company;
TCW Investment Management Company;
*cA* — Nicholas W. Tell, Jr.; Shannon Ward and
Doe 1 through Doe 50, inclusive,    *LcA*

                    Defendants.

*have been dismissed after filing complaint* *NY+ L4*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Intentional Interference with Economic
Relations -- Alan Brill Parties/Brill Bankruptcy
Estate)
(Against Regent, Jacobs and Agents
Schnelling, Dabney, Ames, Tell, TCW General
Partners, AIG Sun America, TCW Group,
TAMCO, TIMCO, Tell and Ward)

(Intentional Interference with Contract -- Alan
Brill Parties/Cumulus)
(Against Regent, Jacobs and Agents
Schnelling, Dabney, Ames, Tell, TCW General
Partners, AIG Sun America, TCW Group,
TAMCO, TIMCO, Tell and Ward)

(Intentional Interference with Economic
Relations -- Alan Brill Parties/Cumulus)
(Against Regent, Jacobs and Agents
Schnelling, Dabney, Ames, Tell, TCW General
Partners, AIG Sun America, TCW Group,
TAMCO, TIMCO, Tell and Ward)

Negligent Interference with Contracts and
Economic Relations -- Alan Brill
Parties/Cumulus and Alan Brill Parties/Brill
Bankruptcy Estate S)
(Against Regent, Jacobs, Regent Agents,
Schnelling, Dabney, Ames, Tell, TCW General
Partners, AIG Sun America, TCW Group,
TAMCO, TIMCO, Tell and Ward)

Combinations To Injure Alan Brill Parties in
Regent Contracts, Brill Bankruptcy, Cumulus)
(Against Regent, Jacobs, Regent Agents,
Schnelling, Dabney, Ames, Tell, TCW General
Partners, AIG Sun America, TCW Group,
TAMCO, TIMCO, Tell and Ward)

(Breach of Written Contract – Indenture
Contract)
(Against Bondholders, TCW General Partners,
AIG SunAmerica)

(Breach of Written Contract – Confidentiality
Contracts)
(Against Bondholders, TCW General Partners,

AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Breach of Implied Covenant of Good Faith and Fair Dealing in Indenture Contract) (Against Bondholders, TCW et al and AIG et al)

(Breach of Implied Covenant of Good Faith and Fair Dealing in Confidentiality Contracts) (Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

Intentional Interference With Contract – Indenture Contract) (Against TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Contract – NextMedia Sale Contract) (Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Economic Relations – Trustee and Bondholders) (Against TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Economic Relations - NextMedia) (Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Economic Relations – Other Media Companies) (Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Negligent Interference With Contract and Economic Relations)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Contracts – Regent Contracts)
   (Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America,TCW Group, TAMCO, TIMCO, Tell andWard)

(Intentional Interference With Econons – Alan Brill Parties/Regent)(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Negligent Interference With Contracts and Economic Relations – Alan Brill Parties/Regent)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Fraud and Misrepresentation to Regent RE Alan Brill Parties and Alan Brill/Regent contracts and Economic Relations in Inducing Regent to Breach Contracts, Promises and Representations to Alan Brill Parties of Written Contract First Regent Confidentiality Contract)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

(Intentional Interference With Contract –
South Central Sale Contract)
(Against Tell, Schnelling, Dabney, Ames,
TCW General Partners, AIG Sun America,
TCW Group, TAMCO, TIMCO, Tell and
Ward)

(Intentional Interference With Economic
Relations – Alan Brill Parties/South Central)
(Against Tell, Schnelling, Dabney, Ames,
TCW General Partners, AIG Sun America,
TCW Group, TAMCO, TIMCO, Tell and
Ward)

(Negligent Interference With Contracts and
Economic Relations – Alan Brill Parties/South
Central)
(Against Tell, Schnelling, Dabney, Ames,
TCW General Partners, AIG Sun America,
TCW Group, TAMCO, TIMCO, Tell and
Ward)

(Combinations To Injure Alan Brill Parties in
South Central Contract and Economic
Relations Regent Contracts, Brill Bankruptcy,
Cumulus)
(Against Tell, Schnelling, Dabney, Ames,
TCW General Partners, AIG Sun America,
TCW Group, TAMCO, TIMCO, Tell and
Ward)

(Fraud and Misrepresentation RE Alan Brill
Parties to South Central in Inducing Regent to
Breach Contracts, Promises and
Representations to Alan Brill Parties of
Written Contract First Regent Confidentiality
Contract)
(Against Schnelling, Dabney, Ames, Tell,
TCW General Partners, AIG Sun America,
TCW Group, TAMCO, TIMCO, Tell and
Ward) (Against Regent)

(Breach of Written Contract – Bridge
Engagement Contract)
(Against Schnelling, Bridge)

(Fraud and Misrepresentation to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Schnelling,)

(Fraud and Misrepresentation to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Bridge)

(Fraud and Misrepresentation to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Dabney)

(Fraud and Misrepresentation to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Ames)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Schnelling)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Bridge)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Dabney)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Ames)

(Fraud and Misrepresentation of Independence)
(Against Dabney)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Cooperation
and Consultation)
(Against Schnelling, Bridge, Dabney, and/or
Ames)

(Fraud and Misrepresentations Regarding
Confidentiality to Alan Brill and Brill Media
Companies in Private Affairs of Alan Brill and
Alan Brill Parties)
(Against Dabney)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Confidentiality
in Private Affairs of Alan Brill and Alan Brill
Parties)
(Against Dabney)

Breach of Written Promises to shift
representation
(Against Dabney)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Cooperation
and Consultation)
(Against Schnelling, Bridge, Dabney and/or
Ames)

(Fraud and Misrepresentations against Alan
Brill and Alan Brill Parties regarding shift in
representation.)
(Against Dabney)

(Breach of Oral Promises made to Alan Brill
and Brill Media Companies of Representation
Shift)
(Against Dabney)

(Fraud and Misrepresentation and Abuse of
Authority, or perception or presentation of
authority thereof, Criminally, Professionally
and Civilly including various threats and acts
of intimidation made from time to time on

Alan Brill and Alan Brill Non-Debtors'
Personnel)
(Against Schnelling)

(Fraud and Misrepresentation and Abuse of
Authority, or perception or presentation of
authority thereof, Criminally, Professionally
and Civilly including various threats and acts
of intimidation made from time to time on
Alan Brill and Alan Brill Non-Debtors'
Personnel)
(Against Bridge)

(Fraud and Misrepresentation in Seeking to
Advise Alan Brill and Alan Brill Parties)
(Against Ames)
(Fraud and Misrepresentation and Abuse of
Authority, or perception or presentation of
authority thereof, Criminally, Professionally
and Civilly including various threats and acts
of intimidation made from time to time on
Alan Brill and Alan Brill Non-Debtors'
Personnel)
(Against Dabney

(Fraud and Misrepresentation and Abuse of
Authority, or perception or presentation of
authority thereof, Criminally, Professionally
and Civilly including various threats and acts
of intimidation made from time to time on
Alan Brill and Alan Brill Non-Debtors'
Personnel)
(Against Ames)

(Violation of Virginia Code SS 18.2-499 and
18.2-500 combinations to Injure in matters of
late 200 and early 2001)
(Against Bondholders, TCW General Partners,
AIG SunAmerica, TCW Group, TAMCO,
TIMCO, Tell and Ward)

(Violation of Virginia Code SS 18.2-499 and 18.2-500 combinations to Injure in matters of Alan Brill and Alan Brill affiliates as Non-Debtors
(Against Regent, Schnelling, Bridge, Dabney, Ames, Tell, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, and TIMCO)

TABLE OF CONTENTS

I.   PARTIES ...........................................................................................................................

   A.   Plaintiffs ..................................................................................................................

      1.   Introduction ....................................................................................................

      2.   Alan R. Brill ..................................................................................................

      3.   Brill Media Company, LP [now known as Business Management Consultants, LP]
         (either being "BMCLP" or the "Management Company"); also being a "Non-
         Debtor" ...... ................... ...........................................................................

      4.   The Alan Brill Companies or the Alan Brill Non-Debtors,
         other than BMCLP ............................................................................................

      5.   Other Alan Brill Affiliates ........................................................................

   B.   Defendants ...............................................................................................................

      1.   Introduction ....................................................................................................

      2.   Regent Communications, Inc. ..........................................................................

      3.   The Debtors Professionals – Anthony H N Schnelling, Esq.; H. Slayton
         Dabney, Esq.; and John W. Ames, Esq.; and Related Organizations ....................

      4.   Nicholas W. Tell, Jr., Esq.................................................... .........................

      5.   TCW et al and AIG et al.......................................................................................

      6.   Other Defendants - John Doe 1 through John Doe 50, inclusive ........... .............

      7.   Defendants Acting Together

II.   JURISDICTION AND VENUE...........................................................................................

III.   FACTS ..........................................................................................................................

   A.   Brill Media Properties ....................................................................................................

   B.   General Business Valuations Considerations -- and Brill Media's Radio Stations and
   Newspapers

   C.   BMCLLC 12% Senior Notes Due 2007 (BMCLLCBonds" or "Bond") ................ .......

   D.   The Indenture Contract ........... .......................................................................

   E.   Payments on BMCLLC Bonds

   F.   Confidentiality Agreements between Brill Media Companies (including Affiliate

Brill Media Company, LP and Alan Brill), TCW and AIG-SunAmerica .......................

E.  Actions Against the Brill Media Companies (including Affiliates Brill Media
    Company LP and Alan Brill) Causing the Bankruptcy of the BondCompany and
    admissions of TCW and AIG-SunAmerica ..........................................................

F.  Actions Against the Brill Media Companies (including Alan Brill and
    the Alan Brill Affiliates) Causing the Bankruptcy Liquidation of the Bond
    Company and Admissions of TCW and AIG-SunAmerica .............................................

G.  Brill Media Companies' Contract with NextMedia for Sales of Colorado and
    Wyoming Radio Stations ...............................................................................................

H.  Interference with the Colorado/Wyoming Sale Contracts .............................................

I.  The Bankruptcy Forum For The BondCompany Liquidation Which
    Was Forced By Defendants' Breach of the confidentiality contracts and
    the Resulting Unlawful and wrongful Acts by Defendants Against Alan Brill
    and the Brill Media Companies ....................................................................................

J.  Regent Communications Background Relationship With Alan Brill And The Brill Media
    Companies ..............................................................................................

K.  The Bankruptcy Process, and Abuse and Wrongful Acts Against Alan Brill and the
    Alan Brill Companies [as well as the BondCompany] By Defendants Debtors
    Professionals and Tell ....................................................................................

L.  The Second Regent Confidentiality Contract and Partnering with Alan Brill and the

    Non-Debtor Companies to Win the Bankruptcy Auction ...............................................

M.  Regent's Withdrawal From Further Participation in the Bankruptcy Sale Process..........

N.  The Replacement Auction Partnering Contract between Alan Brill and Cumulus

    Media, Inc.  ................................................................................................

O.  The Bankruptcy Liquidation Auction of BondCompany Radio Stations and

    Newspapers  ................................................................................................

P.  BondCompany Newspaper Group and Non-Debtor Radio Group Valuations Determinations

    ....................................................................................................................................

Q. Further Interference by Tell ..................... ........... .....................................

CAUSES OF ACTION

PRAYER FOR RELIEF ............................................................................................................

**COME NOW,** plaintiffs, hereinafter named, by and through Alan R. Brill, and allege and state their complaint against the defendants, hereinafter named, as follows.

## I.  PARTIES

### A.   **Plaintiffs**

#### **1. Introduction**

1.  Plaintiffs are set out below to include Alan Brill and a number of, but not all, companies that he owns and a number of individual persons and other companies affiliated with him in his businesses or doing business with him and the company in a position of trust and dependence including persons and companies not yet identified

2.  For the sake of clarity and simplification, all the companies he owned/owns and businesses he operated/operates are generically included under the umbrella name known as "Brill Media". Brill Media consists of some one hundred fifteen companies (115) owned, directly or indirectly, by Alan Brill at the time of the events named in this Complaint.

3.  As explanation, Brill Media consisted of one-hundred fifteen (115) holding and operating companies which composed a family of small and medium sized businesses assembled by Alan Brill, a former Peace Corps Volunteer and a native of Evansville, Indiana, to operate and nationally build businesses primarily, but not only, in the field of radios stations and newspapers and activities related thereto.  Though he began Brill Media in and while living in Virginia in 1980, in

1981 and since then Alan Brill has lived in Evansville, Indiana and Brill Media has been headquartered in Evansville, IN as its principal place of business overall.

4.   Seventy-three of those Brill Media companies were under the ownership of a seventy-fourth, a holding company, Brill Media Company, LLC ("BMCLLC"), and that group of companies shall hereinafter be designated as a whole as the "BondCompany" or the "Debtors" or the "BMCLLC Companies". A single one of this group or a sub group shall be referred to as the "Debtor Radio Group" or "Debtor Newspaper Group" or "Debtor (individual company designation or other sub-group designation)".

5.   After an Involuntary Petition under Chapter 7 of the US Bankruptcy Code was filed against three companies of the BondCompany on January 17, 2002, soon thereafter all 74 companies composing the BondCompany became debtors under Chapter 11 of the US Bankruptcy Code and thereafter composed the Brill Media Company, LLC Bankruptcy Estate ( "BMCLLC Estate" or "Bankruptcy" or "Bankruptcy Estate").

6.   Those companies of Brill Media that are not part of the BondCompany, or of the Debtors, can hereinafter be known, as a group, as the "Alan Brill Companies" or the "Alan Brill Affiliates" or the "Non-Debtor Companies" or the "Non-Debtor Affiliates" or the "Non-Debtors"; or singularly a "Non-Debtor Affiliate" or an "Alan Brill Affiliate" or A Non-Debtor. A subgroup or a single entity of the Non-Debtor Affiliates may be known as the "Non-Debtor (whatever, as Radio Group or Radio Stations or named entity)". At the period of time discussed herein, all of the Brill Media companies, Debtor or Non-Debtor, and other businesses of Alan Brill were managed and controlled by and through Brill Media Company, LP [now known as Business Management Consultants, LP] (in either case, "BMCLP" or the "Management Company") without any ownership of other entities, under fee-based contracts with the other companies as the "corporate office". At the present time and after the date of the events in this Complaint, the Debtors are no longer controlled by ownership or management contract by either Alan Brill nor the Management Company.

7.  The Plaintiffs in the Complaint are separately and jointly Alan Brill; Brill Media
    Company, LP; the Alan Brill Companies or the Non-Debtors; and certain Other
    Non-Debtor Affiliates or Other Alan Brill Affiliates, whether individuals or
    companies, as further set forth below.  The term "Alan Brill Plaintiffs" refers to
    all of the above as a single group.

## 2.    Alan R. Brill

8.  Plaintiff Alan R. Brill was born and raised in Evansville, left for twenty years and
    then returned to Evansville to reside there as a resident of Evansville, Indiana now
    for over twenty-five years and was (and still is in majority) the owner, directly
    and indirectly of the Alan Brill Companies or the Non-Debtors, as well as having
    through the events described herein been the sole owner of all the Brill Media
    companies including the BondComany.

## 3.    Brill Media Company, LP [now known as Business Management Consultants, LP] (either being "BMCLP" or the "Management Company"); also being a Non-Debtor

9.  Plaintiff BMCLP is a limited partnership organized pursuant to the laws of the
    Commonwealth of Virginia with its principal place of business in Evansville,
    Indiana.  It is through BMCLP that Alan Brill operates and manages and oversees
    all of his other companies and businesses now n and at all times relevant to
    matters in the Complaint.

## 4.    The Alan Brill Companies or Alan Brill Non-Debtors Other Than BMCLP\

10. Plaintiff ARB Finance-One, Inc. (now known as Nexus Systems, Inc.) is a
    corporation organized pursuant to the laws of the Commonwealth of Virginia,
    with its principal place of business in Arlington, Virginia.

11. Plaintiff ARB Finance-Two, Inc. is a corporation organized pursuant to the laws
    of the Commonwealth of Virginia, with its principal place of business in
    Richmond, Virginia.

12. BEL, LLC is a limited liability company organized pursuant to the laws of the
    Commonwealth of Virginia, with its principal place of business in Richmond,
    Virginia.

39728                                    14

13. Plaintiff BH One, LLC is limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

14. Plaintiff BH Two, LLC is limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

15. Plaintiff Brill Media Company, Inc. (now known as Business Management Holdings, Inc.) is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

16. Plaintiff Brill Media Holdings, LLC. is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

17. Plaintiff Broadcasting, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

18. Plaintiff Central Michigan Directories, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Mt. Pleasant, Michigan.

19. Plaintiff CI, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

20. Plaintiff C.M. Realty, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

21. Plaintiff CMR Investments, LP is a limited partnership organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Mt. Pleasant, Michigan.

22. Plaintiff DRI, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Duluth, Minnesota.

23. Plaintiff DRII, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Duluth, Minnesota.

24. Plaintiff ERC I, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

25. Plaintiff ERC II, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

26. Plaintiff Huron Holdings, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

27. Plaintiff Huron Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

28. Plaintiff Lancaster-York Broadcasting, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

29. Plaintiff Lancaster-York Broadcasting Management, Inc is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

30. Plaintiff Lancaster-York Holdings, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

31. Plaintiff Lancaster-York Holdings Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

32. Plaintiff Learning Research, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

39728

16

33. Plaintiff Northern Holdings, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

34. Plaintiff Northern Colorado Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

35. Plaintiff Northland Holdings, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

36. Plaintiff Northland Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

37. Plaintiff Northwest Radio, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

38. Plaintiff Outdoor Advertising, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

39. Plaintiff Pontiac Newspapers, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

40. Plaintiff Promotion Publications, Inc. (now known as TC2, Inc.) is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

41. Plaintiff Sign Easy, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

42. Plaintiff Tower Company, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Evansville, Indiana.

43. Plaintiff TSB II, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

44. Plaintiff TSB III, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

45. Plaintiff TSB III Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

46. Plaintiff Tri-State Holdings, LLC. is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

47. Plaintiff Tri-State Holdings Management, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

48. Plaintiff WRM, LLC. (now known as Nexus Services, LLC) is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Arlington, Virginia.

49. Plaintiff WYM, LLC is a limited liability company organized pursuant to the laws of the Commonwealth of Virginia, with its principal place of business in Richmond, Virginia.

**5. Other Alan Brill Affiliates**

50. Doe 1 through Doe 50 are individuals or companies formerly associated as employees or partners or business associates with Alan Brill and/or BMCLP or the Other Alan Brill Companies.

**B. Defendants**

**1. Introduction**

51. Defendant Regent Communications, Inc. ("Regent") is a large radio broadcasting company, publicly traded, which owns and operates about 64 radios stations in 9 states. It is headquartered now in Cincinnati, Ohio; however at the time of the

actions named herein its headquarters were in Covington, KY. It operates radio stations in Evansville, Indiana.

52. Defendant Anthony H N Schnelling ("Schnelling") is a lawyer licensed to practice law in the State of New York and he also founded and is the Managing Director/CEO of Bridge Associates, LLC within which he practices nationally as a bankruptcy crisis manager consultant, in the course of which Alan Brill as CEO engaged him to consult to the BondCompany and its Stakeholder, Alan Brill Defendant Bridge Associates, LLC ("Bridge") is a large national consulting firm, a relatively new but significant participant in business crisis-management consulting whose relevant business is to provide, as experts, information and advice in assisting and representing its clients through the unfamiliar process of bankruptcy. Defendant H. Slayton Dabney, Jr., Esq. ("Dabney") is a lawyer, presently with the law firm of King & Spalding LLP in its New York, New York office, who practices nationally, specializing in the representation of clients in the battleground bankruptcy process and environment in which the client and its regular counsel are not likely to be familiar and they need an experienced competent expert to rely on for sound unbiased counsel and guidance in order to survive. Defendant John W. Ames, Esq. ("Ames") is a lawyer, presently with the law firm of Greenebaum Doll & McDonald PLLC ("GDM") in its Louisville, Kentucky headquarters office, who practices often in Indiana as well as nationally, specializing in the representation of clients in the battleground bankruptcy process and environment in which the client and its regular counsel are not likely to be familiar and they need an experienced competent expert to rely on for sound unbiased counsel and guidance in order to survive. Defendant Greenebaum Doll & McDonald PLLC is a large law firm headquartered in Louisville, KY with a bankruptcy practice led by Defendant John W. Ames, Esq. and which practice is often conducted in Indiana as well as nationally. Defendants Schnelling, Dabney and Ames are also each a "Debtor Professional" or together the "Debtor Professionals" in the BMCLLC Bankruptcy.

53. Defendant Nicholas W. Tell, Jr., Esq. ("Tell") a resident of the State of California, is an employee of a Defendant TCW Group, Inc. ("TCW Group") affiliate and is

39728

19

an officer or agent of numerous companies and affiliates of Defendant TCW
Group, a large financial management company with over $80 Billions under
management, now majority owned indirectly by a French company, Societe'
General S.A. of great assets size itself. Defendant TCW Group and its affiliates
manage investment funds that benefit from Defendant TCW's expertise in vulture
raiding and acquisition of target companies thought to be undervalued, utilizing
the inroads of providing debt funding to such target companies in order to
establish a claim on the assets which they hope to make available for seizure; and
Defendant Tell is an expert in that organization in conducting the attacks and
maintaining the battle to steal the value of the vulture-investment targets for the
benefit of the various Defendant TCW Group related funds, though such targets
would not have entered into the service of the TCW Group with the thought of
being such a target.

54. Shannon Ward ("Ward") is an officer of AIG SunAmerica ("AIG SunAmerica"),
    a very large investment company also located and doing business in California
    and elsewhere.

55. AIG SunAmerica and TCW Group Affiliates are Bondholders of then publicly
    traded securities of the BondCompany. Tell, the TCW Group and named
    affiliates, Ward and AIG SunAmerica are also defendants (the "California
    Defendants") in litigation brought against them in California on behalf of the Brill
    Bankruptcy Estate to recover for damages they caused the BondCompany by their
    wrongful acts against the BondComany (the California Litigation"); they also
    caused damages by their same wrongful acts against affiliated parties of the
    BondCompany and also other Bondholders, including the Alan Brill Plaintiffs as
    both BondCompany affiliates and as Bondholders.

56. The Complaint in the California Litigation is hereby incorporated by reference
    for purpose of information and reference.

57. Defendants Regent and Jacobs developed a relationship of many months with
    Plaintiff Alan Brill in respect to the possibility of acquiring the radios stations of
    the Brill Media companies and in the process entered into Confidentiality
    Contracts intended to restrict Defendant Regent from taking adverse actions

against first the Brill Media companies and then the Alan Brill Plaintiffs and made other representations and promises by which Plaintiffs believed that they could rely on the good faith and fair dealings of Defendants Regent and Jacobs with respect to the interests of Plaintiffs Alan Brill and the Alan Brill Affiliates. Defendants Regent and Jacobs as set forth herein breached its contracts and promises with Plaintiffs and its duties of good faith and fair dealing under such contracts and promises and representations, all both written and oral, and wrongfully interfered with other of Plaintiffs' contracts and prospective economic relations with other parties. As a direct and proximate cause of Defendant's wrongful acts, Plaintiffs Alan Brill and the Alan Brill Affiliates were wrongfully denied the transactions by which certain of their radio station assets would have been exchanged evenly for newspapers assets of much greater value, such newspaper assets having a court-determined valuation confirmed by subsequent cash considerations, that would have benefited Alan Brill Plaintiffs with a realization of direct gain of real assets having value in excess of $20Million over the the the value of Alan Brill Radios Stations relinquished; and then Alan Brill Plantiffs were also denied related benefits of direct and indirect value of Tens of Millions of Dollars more_. Defendants Regent and Jacobs also wrongly interfered, in coordination with other Defendants herein, with Plaintiffs Alan Brill and Alan Brill Affiliates' contracts and prospective economic relations, including that with partner Cumulus Media, Inc. among others, in conjunction with the BMCLLC Bankruptcy.

58. Defendants Schnelling, Bridge, Dabney and Ames were engaged by Plaintiff Alan Brill and BMCLP to represent BMCLLC, or the BondCompany, a part of the Brill Media companies wholly owned by Plaintiff Alan Brill and for which he was the President and CEO, in a bankruptcy proceeding wrongfully forced by Defendant Nicholas W. Tell, Jr., Esq. and other Defendants (also the "California Defendants") as also named in the action presently standing in the Superior Court of the State of California, Los Angeles Division Case, NO. BC294589 on behalf of the Bankruptcy Estate of Brill Media company, LLC and its 73 subsidiaries, which action was brought by Special Counsel on behalf of the BMCLLC Estate

who were engaged under the leadership of Plaintiff Alan Brill as the representative of the BMCLLC Estate for this purpose as approved by the Bankruptcy Court (the "California Litigation"). Authority for such actions against the California Defendants was long and strongly resisted in the BMCLLC Bankruptcy Proceedings by Defendant Tell and by other now California Defendants in such litigation, as well as by the Defendant Debtors Professionals in this action, Defendants Schnelling, Dabney and Ames pretending to act on behalf of the BMCLLC Estate but seeking to minimize risk to the California Defendants, all members of the "bankruptcy club". Defendants Schnelling, Dabney and Ames entered into engagement contracts with Alan Brill on behalf of the BondCompany and its StakeHolder, and on the approval by the Bankruptcy Court of their engagement on behalf of BMCLLC, became the Debtors Professionals charged as Officers of the Court with guiding the BMCLLC Bankruptcy Estate management through the bankruptcy process and against the obvious seizure motives of the Bondholder California Defendants (now in the California Litigation). Defendant Debtors Professionals Schnelling, Danby and Ames, however, with knowledge of confidential information in the affairs of Plaintiff Alan Brill personally and with respect to the Plaintiff Alan Brill Affiliates and, with interest in lining their pockets with fees and establishing relations for their marketing purposes in the backruptcy club, conducted wrongful collaboration with Defendants including Defendant Nicolas W. Tell, Jr., Esq. and his representatives, did wrongfully conduct conflicted actions in their supposed representation of the BMCLLC Bankruptcy Estate; in the misuse of information confidentially obtained regarded the affairs of Plaintiff Alan Brill and the Plaintiff Alan Brill Affiliates; the wrongful forced removal of their engager and supervisor, Plaintiff Alan Brill, from the affairs of the Bankruptcy Estate of the companies he owned, BMCLLC, in its critical stages for planning and processing of resolution and settlement of the claims against it; and in opposing and striving to sabotage the efforts to bring litigation actions against the California Defendants in the California Litigation. On knowledge and belief, such actions and resulting damages, among others, in the relevant instance also included interference with

the Regent Confidentiality Contracts and promises and representations, while being aware of such restrictions and agreements of Defendants Regent and Jacobs for the benefit of Plaintiffs Alan Brill and the Alan Brill Affiliates; and use of confidential information the Defendant Debtors Professionals held about Alan Brill and the Alan Brill Affiliates to incite and motivate and induce and encourage Defendant Regent to breach its obligations, promises and restrictions against it, contractual and otherwise, Written and oral, to the Alan Brill Plaintiffs; and to cause Defendants Regent and Jacobs to wrongfully participate and succeed in the BMCLLC Bankruptcy Auction in which participation by Regent the Alan Brill Plaintiffs were eventually denied the many millions of dollars of due gain that would have been theirs as well as better result for the constituencies to the bankruptcy but for the prohibited Defendant Regents participation and interference and wrongful acts together by Regent, Jacobs, Tell and Debtors Professionals.

59. On knowledge and belief, Defendant Nicholas Tell, Jr. Esq., ("Tell") while aware of agreements and restrictions of and on Regent for the benefit of the Alan Brill Plaintiffs, did encourage, incite, induce, motivate and otherwise cause Defendant Regent to breach its obligations, promises and representations made thereunder to the Alan Brill Plaintiffs and to wrongfully participate in the Auction by which participation the Alan Brill Plaintiffs were denied the gain and other benefits that would have been theirs but for the Defendants Regent and Jacobs participation and interference, along with interference by Tell and the Debtor Professionals..

60. On knowledge and belief, Defendants did conspire between and among themselves -- Defendant Tell and Defendants Debtors Professionals, together; Defendant Tell and Defendant Regent; Defendants Debtors Professionals and Defendant Regent; and Defendants Debtors Professionals and Defendant Regent together --- did encourage, incite, induce, motivate and otherwise cause Regent and Jacobs to breach their obligations, promises and representations thereunder to the Alan Brill Plaintiffs and participate in the Auction by which participation the Alan Brill Plaintiffs were denied the gain that would have been theirs but for the Defendant Regent participation and interference; and to assure Defendant Regent,

using confidential knowledge about the Alan Brill Plaintiffs and in anticipation of Defendants' persecutory anticipated actions against Alan Brill Plaintiffs, that Defendant Regent would be certainly free of risk from the Alan Brill Plaintiffs as they would be rendered virtually impotent by the assault against the Alan Brill Plaintiffs by actions and proceedings controlled by Defendant Tell and the Defendant Debtors Professionals in the Bankruptcy proceedings and means of interference in the economic relations of the Alan Brill Affiliates outside of the BMCLLC bankruptcy proceedings; and directly and indirectly breach contracts, promises and representations, both oral and written, made for the benefit of Plaintiffs Alan Brill and Alan Brill Affiliates.

61. As a direct and proximate cause of Defendants' wrongful acts, all of Plaintiff Alan Brill parties were wrongfully denied tens of millions of dollars of value realization in the Regent matter as well as other benefits _____ and further denied relief from continuing financial, legal and emotional pressures on their struggling affairs caused by Defendants; and further denied claims against the Estate, denied Plaintiff Alan Brill expectation satisfaction of more full settlement in the tens of millions of dollars and closure of the Estate for the benefit of the creditors and equity holders other than the California Defendants named in the California Litigation and in restraint of the outrageous fees payments to the Defendant Debtors Professionals.

## 2. Regent Communications, Inc.

62. Defendant Regent Communications, Inc. ("Regent") is a publicly traded corporation organized pursuant to the laws of the State of Delaware, is headquartered now in Cincinnati, Ohio [but at the time of the actions herein Defendant Regent was in Covington, Kentucky]; and through wholly owned subsidiaries Defendant Regent conducts radio stations business in Evansville, Indiana including radio stations formerly owned by Debtors. Defendant Terry S. Jacobs, resident of the state of Ohio, was at all times in the actions reported herein the Chairman and/or President and Chief Executive Officer of Defendant Regent, and he was Plaintiff Alan Brill's primary contact at Regent.

### 3.The Debtors Professionals -- Anthony Schnelling, Esq.; H. Slayton Dabney, Jr. Esq.; and John W. Ames, Esq.; and Related Organizations

63. Defendant Anthony Schnelling, Esq. ("Schnelling") on knowledge and belief resides in the States of New York and Florida and is admitted to the practice of law in the State of New York, Defendant Schnelling was engaged by Plaintiff Alan Brill to represent the BMCLLC/BondCompany, owned by its CEO Plaintiff Alan Brill, in its bankruptcy.

64. Defendant Bridge Associates, LLC ("Bridge") on knowledge and belief is a limited liability company organized pursuant to the laws of New York with its principal place of business in New York, New York. Defendant Bridge was founded by Defendant Schnelling, and Defendant Schnelling is its Managing Director and CEO. Defendant Bridge was engaged by Plaintiff Alan Brill to represent BMCLLC, owned by its CEO Plaintiff Alan Brill, in its bankruptcy.

65. H. Slayton Dabney, Esq. ("Dabney") on knowledge and belief resides in the State of New York and is admitted to the practice of law in the State of New York and the Commonwealth of Virginia. . Defendant Dabney was engaged by Plaintiff Alan Brill to represent the BMCLLC/BondCompany, owned by its CEO Plaintiff Alan Brill, in its bankruptcy.

66. Defendant John W. Ames, Esq. ("Ames") on knowledge and belief resides in the State of Indiana and is admitted to the practice of law in the State of Kentucky. Defendant Ames was engaged by Plaintiff Alan Brill to represent the BMCLLC/BondCompany, owned by its CEO Plaintiff Alan Brill, in its bankruptcy.

67. Greenebaum Doll & McDonald PLLC ("GDM") is a large law firm with its principal place of business in Louisville, Kentucky, and Defendant Ames is a Member of GDM. Defendant GDM was engaged by Plaintiff Alan Brill to represent the BMCLLC/BondCompany, owned by its CEO Plaintiff Alan Brill, in its bankruptcy.

### 4. Nicholas W. Tell, Jr. Esq.

68. Defendant Nicholas Tell, Jr., Esq. ("Tell") on knowledge and belief is a resident of the State of California. Defendant Tell is Managing Director of TAMCO and TIMCO and an agent of defendants SHOP IIB, SHOP III, LINC, LINC II, LINC III and LINC IV.

69. Defendant Tell is a California Defendant in the California Litigation.

## 5. TCW Group, Inc and AIG-SunAmerica and Related Parties

### a. Introduction

70. Defendant TCW Group, Inc. (TCW Group) is a large financial management company with about Eighty Billion Dollars ($80,000,000,000) under management. Defendant AIG-SunAmerica, Inc.,(AIG SunAmerica) is part of a large insurance, financial management and services conglomerate with over One Hundred Fifty Two Billion ($152,000,000,000) in assets held. Additional defendant affiliates of TCW Group and AIG SunAmerica are the beneficial owners of BMCLLC Bonds or such owners' general partners, agents, advisors and managers. BMCLL Companies were either obligors on the BMCLLC Bonds or were unconditional joint and several guarantors of them. Defendants, as set forth herein, breached their contracts with Plaintiffs and their duties of good faith and fair dealing under such contracts and wrongfully interfered with Plaintiffs' contracts and economic relations. As a direct and proximate cause of defendants' wrongful acts, all of BMCLLC Companies were wrongfully forced to default on their bond debt and to liquidate which, but for defendants' unlawful actions, was entirely avoidable and unnecessary; as well as direct and indirect causes of damages of the Alan Brill Plaintiffs.

71. Each of such TCW Group _____ and AIG SunAmerica _____Defendants is also a California Defendant in the California Litigation for recovery on behalf of the BMCLLC Bankruptcy of damages caused by the wrongful acts of such Defendants.

### b. TCW Bondholding Funds – The "SHOP" and "LINC" Funds

72. Defendant Shared Opportunity Fund IIB, L.L.C. ("SHOP IIB") is a limited liability company, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. As of January 14, 2002,

26

SHOP IIB owned $2,000,000 of BMCLLC Bonds.

73. Defendant TCW Shared Opportunity Fund III, L.P. ("SHOP III") is a limited partnership, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. As of January 14, 2002, SHOP III owned $16,610,000 of Brill Media Bonds.

74. Defendant TCW Leveraged Income Trust, L.P. ("LINC") is a limited partnership, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. As of January 14, 2002, LINC owned $9,100,000 of BMCLLCa Bonds.

75. Defendant TCW Leveraged Income Trust II, L.P. ("LINC II") is a limited partnership, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. As of January 14, 2002, LINC II owned $5,375,000 of BMCLLC Bonds.

76. Defendant TCW LINC III CBO Ltd. ("LINC III") is a limited liability company, organized pursuant to the laws of Bermuda, with its principal place of business in Los Angeles, California. As of January 14, 2002, LINC III owned $5,000,000 of BMCLLC Bonds.

77. Defendant TCW Leveraged Income Trust IV, L.P. ("LINC IV") is a limited partnership, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. As of January 14, 2002, LINC IV owned $7,000,000 of BMCLLC Bonds.

**c. AIG-SunAmerica, Inc. on Behalf of Bondholders**

78. Defendant AIG-SunAmerica, Inc. ("AIG-SunAmerica") is a corporation, organized pursuant to the laws of the State of Delaware, with its principal place of business in Los Angeles, California. SunAmerica, Inc., the predecessor in interest of AIG-SunAmerica, was a public company that was acquired by American International Group, Inc., a New York Stock Exchange Company, effective January 1, 1999. AIG-SunAmerica, the successor to SunAmerica, Inc., is no longer a public company. AIG-SunAmerica's parent, the American International Group, is a financial and insurance conglomerate with self-described "global dominance." As of January 14, 2002, AIG-SunAmerica had purchased, on behalf

27

of certain accounts, $21,700,000 of BMCLLC Bonds. AIG-SunAmerica provided
management services and investment advice to these accounts.

**d.   General Partners of TCW Bondholding Funds ("TCW General Partners")**

79. Defendant TCW (SHOP III) L.P. ("TCW (SHOP III)") is a limited partnership,
organized pursuant to the laws of the State of Delaware, with its principal place of
business in Los Angeles, California. TCW (SHOP III) is the general partner of
SHOP III. TCW Asset Management Company is the general partner of TCW
(SHOP III).

80. Defendant TCW Advisers (Bermuda), Ltd. ("TCW Bermuda") is an "off-shore"
limited liability company, organized pursuant to the laws of Bermuda, with its
principal place of business in Los Angeles, California. TCW Bermuda is a
general partner of defendants LINC and TCW (LINC II), L.P.

81. Defendant TCW (LINC II), L.P. ("TCW (LINC II)") is a limited partnership,
organized pursuant to the laws of the State of Delaware, with its principal place of
business in Los Angeles, California. TCW (LINC II) is a general partner of LINC
II.

82. Defendant TCW (LINC IV) L.L.C. ("TCW (LINC IV)") is a limited liability
company, organized pursuant to the laws of the State of Delaware, with its
principal place of business in Los Angeles, California. TCW (LINC IV) is the
general partner of LINC IV.

**e.   TCW Parent Corporation**

83. Defendant "The TCW Group, Inc." ("TCW Group") is a corporation, organized
pursuant to the laws of the State of Nevada, with its principal place of business in
Los Angeles, California. TCW Group is the parent company of defendants TCW
Asset Management Company and TCW Investment Management Company.
TCW Group is an authorized representative of TCW Bermuda. TCW Group is an
indirect subsidiary of Société Générale, S.A., a French corporation, and is the
holder of the registered trademark TCW.

**f.   TCW Investment Advisors to TCW Bondholding Funds**

84. Defendant TCW Asset Management Company ("TAMCO") is a corporation,
organized pursuant to the laws of the State of California, with its principal place

of business in Los Angeles, California. TAMCO is a subsidiary of the TCW Group. TAMCO is the investment advisor to defendants SHOP IIB, SHOP III and LINC IV.

85. Defendant TCW Investment Management Company ("TIMCO") is a corporation, organized pursuant to the laws of the State of California, with its principal place of business in Los Angeles, California. TIMCO is a subsidiary of the TCW Group. TIMCO is the investment advisor or collateral manager for defendants LINC, LINC II and LINC III.

**g.   Individual Managers and Agents of TCW and AIG SunAmerica Defendants**

86. Defendant Nicholas W. Tell, Jr. ("Tell" or "defendant Tell") is a Managing Director of TAMCO and TIMCO and an agent of defendants SHOP IIB, SHOP III, LINC, LINC II, LINC III and LINC IV, Shannon Ward ("Ward" or "defendant Ward") is a Vice President and agent of defendant AIG SunAmerica.

**6. Other Defendants**

87. Plaintiffs are presently unaware of the true names and capacities of the defendants named in this complaint as Doe 1 through Doe 50, inclusive, and so have sued those defendants under fictitious names. Plaintiffs will seek leave to amend this complaint to state the true names and capacities of Doe defendants once those have been ascertained.

**7. Defendants Acting Together**

88. Each of the defendants, except as otherwise stated, was, at all times relevant herein, the agent or employee of the remaining defendants, engaged in the conduct alleged in this complaint while acting within the scope of that agency or employment, and did so with the knowledge, consent, approval and ratification of each of the remaining defendants.

## II.   JURISDICTION AND VENUE

89. Plaintiff Alan Brill is a resident of Indiana which also is his principle place of business and it is also so for most of his active companies. The wrongful acts alleged herein occurred in significant part in Indiana or in respect to activities and

persons or entities located in Indiana or doing business in Indiana or about activities taking place in Indiana.  Venue is proper in Vanderburgh Circuit Court, State of Indiana.

## III.  FACTS

### A.  Brill Media Properties

#### 1.     Introduction

90. In 1997, Alan Brill, through the Brill Media Companies, owned eleven (14) middle-market radio stations in Indiana, Kentucky, Missouri, Pennsylvania, Minnesota, Wisconsin and Colorado, and fourteen (14) small market newspapers and publications in the lower Michigan peninsula.  Three of these radio stations were sold pursuant to a contract in effect in 1997 and, by 2002, the radio station group was expanded to encompass four more radio stations, two in Colorado, one in Minnesota and one in Indiana and a license for a radio station in Wyoming. The newspapers were expanded by 2002 to encompass a total of thirty-four (34) newspapers and publications in the Lower Peninsula of Michigan.

91. The radio stations of Brill Media in 1997, as well as the four additional acquisitions thereafter, all had very good Arbitron rankings and operating results for these markets, with group station rankings for audience ratings and revenues of mostly "1." (the "Radio Group") _____

92. Four of the radio stations were owned by Alan Brill in his Non-Debtor Radio Group in Pennsylvania, Indiana, Kentucky and Colorado.  Two of them were very significant radio properties competing  in markets in which the BondCompany also had very strong and important radio clusters, all operating in a competitively coordinated manner to maximize overall results.

93. The newspapers of Brill Media in 1997 and those thereafter acquired were centered in a seventeen (17) county area of small communities in Central Michigan.  They ranged from two daily newspapers and a weekly newspaper to

numerous shopping guides, niche publications such as vacation guides and a monthly business report. Their total circulation in 1997 was over 250,000. The central offices and production facility for the Brill Media newspapers in 1997 and thereafter through the period of the allegations herein were in Mt. Pleasant, Michigan. By 2002, the Michigan newspapers and related publications had expanded to include thirty-six (36) counties, covering over 400,000 homes in a contiguous geographic area in the lower peninsula of Michigan, which was geographically three times larger than in 1997 (the "Newspaper Group"). The newspaper group when originally started had negative consolidated cash flow at the annual negative rate of <$700,000>; over the years the Newspaper Group grew to dominate its market area and was generating annual cash flow in the $7 Million range. The Newspapers Group was owned in the Bond Company.

## B.  General Media Business Valuation Considerations – and Brill Media 's Radio Stations and Newspapers

94. The primary assets of plaintiffs' successful media properties described in the previous three paragraphs are intangible. Such assets significantly consist of human relationships, developed and earned, between, on the one hand, plaintiff media companies' officers, management and staff and, on the other hand, (a) as a team, their fellow managers, media talents, sales professionals, production talents and other support employees, and (b) those essential external parties such as advertisers and other customers, listeners and readers, market-community influencers and sources, vendors, distributors, and suppliers. As was true of similar media companies, plaintiffs' "hard" assets -- such as printing presses or office or studio equipment or broadcast towers -- constituted a relatively very small part of plaintiffs companies' overall value.

**C. BMCLLC 12% Senior Notes Due 2007 ("BMCLLC Bonds" or "Bonds")**

95. In order to obtain long term capital, for acquisitions and operating capital and to refinance existing short term debt, Alan Brill in 1997 split Brill Media Companies into two groups of companies and properties with one group owned under a new holding company called Brill Media Company, LLC ("BMCLLC") or the BondCompany also wholly owned indirectly by Alan Brill. BMCLLC then became the sole owner, directly or indirectly, eventually of 73 subsidiary companies which included all of the Newspaper Group and all of the Radio Group except for other Alan Brill owned companies then or eventually owning a radio station in York, PA, two radio stations serving Evansville Indiana and a radio station near Cheyenne, Wyoming and serving Colorado.

96. BMCLLC and its subsidiaries were or became knows as "BMCLLC", the "BondCompany", the "Brill Debtors" and/or the "Debtors". The radio stations companies in the BondCompany are the "Debtor Radio Group" or the "BMCLLC Radio Group" or the "BondCompany Radio Group" or the "Debtor Stations".

97. The radio stations owned by Alan Brill in Brill Media other than in the BMCLLC Radio Group are the "Alan Brill Radios Group" or the "Non-Debtor Radio Stations".

98. The Alan Brill Radio Stations existed in the same markets as radio stations in the BondCompany Radio Group, effectively competing against the radio stations in the BondCompany Radio Group, although that competition and operations were coordinated in the same way philosophically that the BondCompany Radio Stations in a particular market competed against each other in order to maximize the market results for the overall market group of Brill Media owned stations, Debtor and Non-Debtor.

99. Besides the Alan Brill Radio Group, Alan Brill retained for his direct ownership, outside of the BondCompany, numerous other companies operating businesses in

telephone director publishing, communication towers leasing, real estate and other various business. Most importantly, Alan Brill retained direct ownership, outside of the BondCompany, of Brill Media Company, LP (BMCLP) now known as Business Management Consultants, LP (also "BMCLP") It was though BMCLP that Alan Brill controlled, managed and operated all of the other Brill Media companies, both Debtor and Non-Debtor, pursuant to fee based management agreements between BMCLP and each of the other companies. BMCLP was effectively the corporate headquarters function for all the Brill Media companies, Debtor or Non-Debtor. The corporate officers as well as the corporate staff were all employees of BMCLP and not employees of the Debtors.

100.     Immediately following the split off of Brill Media companies in late 1997 into the BondCompany, the BondCompany issued $108,000,000 in publicly traded bonds in December 1997 (the "Bonds"). These bonds consisted of $105,000,000 of Series A Notes and $3,000,000 of Series A Appreciation Notes. In early 1998, these original bonds were exchanged, pursuant to the rights and obligations thereunder and subject to the same terms, for $105,000,000 of 12% Series B Senior Notes due 2007 ("Brill Media Bonds") and $3,000,000 of 12% Series B Appreciation Notes due 2007 ("Appreciation Notes").

101.     Although the issuers of the Bonds were Brill Media Company, LLC and a subsidiary Brill Media Management, Inc., the Bonds were unconditionally guarantied, jointly and severally, by each of the other BondCompany companies that existed at that time, and by all other BondCompany companies that were created thereafter.

## D.  The Indenture Contract

102.     In connection with the issuance and sale of the BMCLLC BondCompany

Bonds, on December 30, 1997, all of the 30 BMCLLCCompanies that were
existing as of that time entered into a written "Indenture" for the BMCLLC
Bonds ("Indenture Contract") with the United States Trust Company of New
York as trustee ("Trustee"), representing the bondholders of the BMCLLC
bonds. The Indenture Contract set out the rights and obligations "for the
benefit of each other" of the signing BMCLLC Companies, on the one hand,
and of the "Trustee" and the "Holders" of the BMCLLC Bonds, on the other
hand. The "Holders" of the BMCLLC Bonds were the registered holders of
such bonds, acting as agents and on behalf of the beneficial holders of such bonds
(jointly or separately referred to as "Bondholders").

103.     By late 2001, each of the then-existing 74 BMCLLC Companies, all of the
BMCLLC companies, had became parties to and were bound by the terms of the
Indenture Contract as "Issuers" or "Subsidiary Guarantors." Each of the
Bondholders of the BMCLLC Bonds, including California defendant Bondholders
herein and California defendant Bondholders' agents, advisors and managers, on
behalf of the California defendant Bondholders, became bound by the terms of the
Indenture Contract because the Bonds they purchased expressly state:

> *The Issuer issued the Securities under an Indenture dated as of*
> *December 30, 1997 (the 'Indenture') among the Issuers, the*
> *Subsidiary Guarantors and the Trustee.* **The terms of the**
> **Securities include those stated in the Indenture** *and those made*
> *part of the Indenture by reference to the TIA as in effect on the*
> *date the Indenture is qualified, except as the Indenture otherwise*
> *provides.* **The Securities are subject to all such terms, and**
> **Security holders are referred to the indenture and the TIA for a**
> **statement of such terms.**

104.     The Indenture Contract functioned to provide a framework and rules
within which the "Issuer" and their affiliates, the "Subsidiary Guarantors," the
"Trustee" and the "Holders" were permitted or required to act, and, beyond which
they could not act without the specific consent of specified parties. The
Indenture Contract provided, inter alia, a) that the BMCLLC Companies could

sell any of their assets for fair value; b) that proceeds of such sale from "Unrestricted Subsidiaries" and net proceeds (as defined) from the sale of assets, including a specific exemption up to $10,000,000, from Restricted Subsidiaries, could be used for any permitted purpose by the BMCLLC Companies, without their being required to apply any of such proceeds to repayment of principal on the BMCLLC Bonds; c) that certain procedures and a sixty (60) day waiting period had to occur between an "Event of Default" by the Issuer and suit or remedy taken by Bondholders without the Trustee; and d) that no Bondholders could use the Indenture Contract to prejudice the rights of or to obtain a preference or priority over another Bondholder Defendant Bondholders breached all of these provisions, as set out hereinafter.

105.     Certain Bondholders breached all of these provisions, as set out in that action referred hereto as the California Litigation and such Bondholders are among the Defendants in that California Litigation. Nicholas W. Tell, Jr., Esq. personally is significantly among those named Defendants in the California Litigation. , while also having positioned himself into the thereby conflicted Chairmanship of the Unsecured Creditors Committee in the BMCLLC Bankruptcy.

106.     Alan Brill, too, became a party to the Indenture Contract as he and some of his Non-Debtor companies eventually acquired several million dollars face value of the Bonds as Registered Holders.

## E.   Payments by BMCLLC Companies on the BMCLLC Bonds

107.     Interest payments on the $105,000,000 of BMCLLC Bonds were due semiannually, on June 15 and December 15, commencing on June 15, 1998. Payments were timely made by the BMCLLC Companies, in full, on June 15, 1998, on December 15, 1998, on June 15, 1999, on December 15, 1999, on June 15, 2000, on December 15, 2000 and on June 15, 2001.

108.     The terms of the BMCLLC Appreciation Notes allowed BMCLLC to redeem these notes for full face value of $3,000,000, if an initial public offering of equity

in BMCLLC had not occurred before June 15, 1999. There was no initial public offering of BMCLLC before June 15, 1999. BMCLLC redeemed all of the BMCLLC Appreciation Notes on June 15, 1999, paying all interest and all principal in full.

### F.  BMCLLC Bond Holdings of TCW and AIG SunAmerica

109.    TCW Group Bondholders (SHOP IIB, SHOP III, LINC, LINC II, LINC III and LINC TV), with TAMCO and TIMCO as their investment advisors, purchased $7,500,000 of the BMCLLC Bonds, at their initial offering, based on the full disclosures of the Prospectus and Offering Memorandum for these bonds and subject to the Indenture Contract. Over the period from January 1, 1998 to January 14, 2002 TCW Group Bondholders acquired, on the open market, another $37,383,000 of the BMCLLC Bonds, also subject to the Indenture Contract.

110.    AIG SunAmerica bought, on behalf of certain accounts, $21,700,000 of the BMCLLC Bonds in the initial offering in 1997, based on the full disclosures of the Prospectus and Offering Memorandum for these bonds and subject to the Indenture Contract.

111.    From their initial purchase of the BMCLLC Bonds in 1997 up through the June 15, 2001 payment of $6,300,000 interest on these bonds, none of the TCW Group entities, their investment advisors, TAMCO or TIMCO, nor AIG SunAmerica had expressed to Alan Brill or to any of the BMCLLC Companies any reservations about the operations or finances of the BMCLLC Companies or their relationship to Alan Brill or BMCLLC affiliates who were not a party to the Indenture Contract.

### G.  TCW "Shared Opportunity Funds" (SHOP) and "Leveraged Income Funds" (LINC)

112.    Beginning in 1992, the TCW Group formed and sold interests in limited partnerships and limited liability companies called "Shared Opportunity Funds" ("SHOP"). SHOP I was started in 1992, SHOP II in 1994 and SHOP III in 1998. The

stated strategy employed by the SHOP funds was to invest in distressed situations at a discount to value where an advantage could be gained through the experience of TCW Group personnel in the restructuring process.

113.     The first phase of the SHOP strategy, employed by SHOP IIB and SHOP III and other TCW Group Bondholders, involved identifying distressed situations that provided an opportunity for TCW Group personnel to invest at a discount to the value of the companies' assets, where the TCW Group entities could foresee the potential opportunity to restructure such companies, with or without such companies' cooperation. The second phase of such strategy involved finding or creating situations that provided sufficient control or leverage over the restructuring process by TCW Group entities, working together, to maximize the TCW Group funds' share of upside potential upon exiting the restructuring process. The final phase of the strategy involved maximizing the value of the companies' underlying assets during and upon exiting the restructuring process, through TCW Group personnel and/or their surrogates providing strategic support and operational oversight. In SHOP I through III, the TCW Group entities' principals, it was touted, had taken control of or provided operational oversight for over 20 companies.

114.     Similar strategies were advertised and employed for TCW Group's "Leveraged Income Trust" ("LINC") funds or the "LINC Family of Funds," which included TCW Bondholders LINC, LINC II, LINC III and LINC IV

115.     SHOP IIB and SHOP III acquired $7,500,000 of BMCLLC Bonds from the initial offering of these bonds. This investment was increased, by purchases of the BMCLLC Bonds on the open market at increasing discounts, to $18,610,000 as of January 14, 2002. LINC, LINC II, LINC III and LINC IV acquired, by purchase on the open market (at increasingly steep discounts), the following amounts of the BMCLLC as of January 14, 2002: LINC, $9,100,000; LINC II, $5,375,000; LINC III, $7,000,000; and LINC IV, $5,000,000.

## H.   TCW and AIG SunAmerica Incentives To Create a Default by the BMCLLC

116.     The compensation received by TCW entities and AIG SunAmerica for advising and managing the bond holdings in BMCLLC Bonds of California Defendant Bondholders provided large incentives for the TCW entities and AIG SunAmerica to cause a default of such notes and attempt to acquire equity in BMCLLC radio and newspaper properties. TAMCO received a management fee of 1.5% per annum on the aggregate invested capital as TCW's investment managers for SHOP IIB, SHOP III and LINC IV. TIMCO received a management fee of 1.5% per annum for LINC, LINC II and LINC III, respectively. However, if an investment returned over 8.0% per annum internal rate of return, the TCW General Partner received 20.0% of the profits over that return. In addition, TAMCO and TIMCO were entitled to break-up fees, financial consulting fees, directors' fees, advisory fees and transaction fees, whether generated by them, the TCW General Partner or the partnership. On information and belief, AIG SunAmerica had similar compensation incentives.

117.     BMCLLC, in 1998, 1999, and 2000, when the interest on the bonds was not in default, generated an annualized internal rate of return of only about 8%, and therefore yielded only modest fees and profit for TCW entities. The bonds were not due until 2007 and the return would not significantly increase, absent a default or restructuring of the BMCLLC Companies, as set out in the SHOP and LINC fund strategies. The BMCLLC Bonds provided little bonus compensation to defendants TAMCO, TIMCO or the TCW General Partners, unless the TCW Group Bondholders could obtain a cheap equity stake in BMCLLC, voluntarily or involuntarily, and/or force BMCLLC into a non-curable default under which: a) BMCLLC Bonds, including those purchased at a steep discount, were required, under the Indenture Contract, to be redeemed at face amount, plus a premium, or b) TCW Group Bondholders could seek to receive appreciating equity holdings in the purchasers of the assets.

118.     When the BMCLLC Companies refused to voluntarily give the TCW Group Bondholders an equity interest or to pay off the bonds on unfavorable terms, the TCW Group Bondholders and AIG SunAmerica unlawfully forced the BMCLLC companies into a non-curable default.

119.     Because of the TCW Group entities' fee structure and the SHOP and

LINC funds' stated strategy, an officer of TCW, in December 1999, in reply to a
query from Alan Brill about TCW's willingness to consider selling its holdings
of BMCLLC Bonds, then trading at a discount, stated, "We are holders. We'd be
better off if you defaulted."

120.     Further incentive for the TCW Group and its employee-shareholders,
including defendant Tell to force the BMCLLC Companies into a default on the
bonds occurred with the acquisition of 51% of the TCW Group by the Societe
Generale Group. This acquisition was announced on April 11, 2001 and was
completed on July 8, 2001. The purchase price paid by Societe Generale for
51% of the TCW Group was 16 times TCW's estimated net earnings, before
interest, taxes, depreciation and amortization, for the years 2001-2002. The
estimated price of $880 million could increase very substantially, if TCW Group
controlled entities were able to restructure investments by forcing a default and
thereby achieve better results for the TCW Group than those estimated in 2001
and 2002. The BMCLLC Bonds, with an internal rate of return around 8%, were
a prime candidate for forcing such a restructuring. On information and belief,
large monetary incentives were offered to TCW Group employees, including
defendant Tell to achieve these results in 2001 and 2002, in order to increase the
estimated purchase price of $880 million which was paid to TCW Group
employee-shareholders by Societe Generale for their TCW Group shares.

121.     The TCW Group employees had a continuing interest in achieving these
results. Between 2003 and 2006, Societe Generale was to acquire another 19% of
the TCW Group, in four equal annual installments. The purchase price was also
based on. TCW Group earnings from investments, including TCW Group
entities' substantial investment in the BMCLLC Bonds. Further, the Societe
Generale purchase price was to be paid to employee-shareholders of the TCW
Group with shares of Societe Generale and the performance of the TCW Group
was reflected in the price of those Societe Generale shares.

122.     Upon information and belief, Defendants Nicholas Tell and Shannon
Ward each had compensation agreements with the other defendants for whom
they work under which a substantial component of their compensation was
determined by the financial performance of the assets they managed for those

39

employers. Such compensation was not limited to financial performance
resulting from legitimate or legal actions undertaken by Defendants Tell and
Ward. Rather, increased compensation would result from any sort of
performance, regardless of the illegitimacy or illegality of Tell and Ward's
conduct. Consequently, in undertaking the illegitimate and illegal conduct
alleged below, Tell and Ward each acted out of their own pecuniary motivation 1
in increasing the money that would be put in their pocket, regardless of the impact
on BMCLLC, BMCLLC's employees or, indeed, the other Defendants, of engaging
in illegitimate and illegal conduct.

## I.   The Ad Recession Period and the Post 9/11 shut down of the Capital Markets Recessions in Advertising, the Stock Markets and the U.S. Economy

123.   The BMCLLC Companies, as is typical with media companies, were
heavily dependent on advertising revenues. Beginning in mid 2000, total
revenues in the United States spent on advertising began a steep decline. This
became popularly known as the "Ad Recession." At about the same time, so-
called "dot com" companies began to fail in large numbers. The NASDAQ began
its steep decline, with the loss in equities of NASDAQ stocks exceeding $4.0
Trillion Dollars ($4,000,000,000,000) over the next three years. The NYSE also
entered a steep decline, with the DOW Jones Average falling from 11,908 in
January 2000 to 7,926 in September 2001. The United States economy slipped
into a deep recession in 2001. The terrorist events of September 11th in 2001
resulted in a further decline in the United States economy, hastened the decline in
the stock markets and also brought about a collapse in many capital markets.
These conditions created great difficulty for the BMCLLC Companies in their
plans to restructure their financing, to obtain new financing or to find some other
form of cash infusion. Such conditions were to last well into 2003.

124.    Although the BMCLLC Companies performed better in these difficult
economic times than comparable radio and newspaper companies, it became
impossible for the BMCLLC Companies to meet the December 2001 interest
payment of $6.3 million on the BMCLLC Bonds out of revenues from
operations. The BMCLLC Companies had to restructure the BMCLLC Bond
debt, sell some of their radio or newspaper properties (as they were allowed to
do under the Indenture Contract for the BMCLLC Bonds) or obtain some other
cash infusion, in order to continue to service the interest payments on the
BMCLLC Bonds.

## J.    Confidentiality Agreements Between Brill Media Companies (including Affiliates Brill Media Company, LP and Alan Brill), TCW and AIG-SunAmerica

125.    In connection with possible restructuring of the BondCompany Bond debt
or other funding alternatives, Brill Media company, Inc, the general partner of
Brill Media company, LP, (on behalf of Brill Media Company, LP and its
affiliates including Alan Brill and the Alan Brill as well as the BMCLLC
companies) entered through Nicholas Tell, Jr., Esq. and Shannon Ward into two
written confidentiality agreements, respectively with the TCW Group and its
Affiliates including the TCW defendants named in the California Litigation, dated
September 19, 2001 and with California Litigation defendant AIG SunAmerica
and its subsidiaries, dated October 4, 2001 ("Confidentiality Agreements").

126.    These Confidentiality Agreements provided that the Brill Media Companies and
their affiliates would provide to said defendants certain information with respect
to the Brill Media Companies and their affiliates, which information was non-
public, confidential or proprietary in nature, in exchange for said defendants'
promises: a) not to use the information except in connection with said
defendants' analysis of a transaction, in conjunction with the Brill Media
Companies, for the buy-back of the Brill Media bonds, restructuring of the Brill
Media Companies' debt or other funding alternatives ("Transaction"); b) not to

disclose the information to any persons except in connection with the
Transaction; and c) not to disclose that the information had been made available,
that discussions were taking place concerning the Transaction or any of the terms
or conditions being discussed.

127. Beginning in late September 2001, the Brill Media Companies and their
affiliates provided substantial non-public, confidential or proprietary information
to the defendant Bondholders, TCW General Partners, TCW Group, AIG
SunAmerica, TAMCO, TIMCO, Tell and Ward, pursuant to the Confidentiality
Agreements and subject to their restrictions. This information included: a)
intricate financial details showing the difficulty that the BMCLLC Companies
would have in making the December 17, 2001 interest payment on the BMCLLC
Bonds, if additional cash liquidity could not be obtained; b) the fact that the
Brill Media Companies were contemplating the sale of radio properties to obtain
this liquidity — which sales would require FCC approvals; c) the fact that the
Brill Media Companies were considering entering into "global" solutions with,
or selling radio properties to, NextMedia, Group, Inc. of Englewood, Colorado,
AAA Entertainment L.L.C. of Pawtucket, Rhode Island, Triad Broadcasting
Company L.L.C. of Monterey, California and Regent Communications, Inc. of
Covington, Kentucky, among others ("Potential Buyers"); and d) the fact that
Alan Brill could have significant personal tax liabilities if the BMCLLC
Companies' debt were restructured without planning.

128. From about October 2001 through January 2002, the defendant Bondholders,
defendant TCW General Partners and TCW Group, AIG SunAmerica, TAMCO,
TIMCO, Tell and Ward repeatedly breached the Confidentiality Agreements with
the Brill Media Companies by: a) using the non-public, confidential and
proprietary information given to them under these two agreements and using
conclusions based on such information other than in connection with said
defendants' analysis of the Transaction; b) disclosing the information (or false
allegations based on such information) to persons other than in connection with
the Transaction; and c) disclosing to unauthorized persons that the information
had been made available to them by BMCLP, the management company

BMCLP, that discussions were taking place concerning the Transaction and what the terms or conditions being discussed were.

129.   Defendants breached the Confidentiality Agreements in order to further their own interests, unrelated to the proposed Transaction. The actions constituting these breaches included: a) communicating with. Potential Buyers and warning or threatening them not to do business with the Brill Media Companies; b) casting an unwarranted cloud of fear, uncertainty, and doubt over the perception of Brill Media's financial position and its ability to engage in financial transactions in order to reduce and eliminate interest in the marketplace in engaging in such transactions with Brill Media; c) threatening the Potential Buyers with actions at the FCC if they purchased any of the BMCLLC Company radio stations, even though Defendants had no good faith basis for instituting proceedings at the FCC but wanted instead to scare off Potential Buyers with the potential costs of such actions and the inherent delays they involved; d) telling the Potential Buyers that the BMCLLC Companies were going to default on the BMCLLC Bonds, misleadingly indicating that the default was the result of BMCLLC's actions rather than Defendants' efforts to prevent sales that would allow BMCLLC to avoid default; d) telling the Potential Buyers, falsely, that Alan Brill was working cooperatively with defendants for TCW to handle, in Los Angeles, the due diligence and eventual sale of the Brill Media properties, indicating that Alan Brill had lost effective control of Brill Media; and f) disclosing to the Potential Buyers and others that the confidential and proprietary information from the Brill Media Companies had been made available to them, that discussions had taken place with the Brill Media Companies about the Transaction and what the terms or conditions being discussed were.

## K.   Actions Against the Brill Media Companies (including Affiliates BMCLLC Company, LP and Alan Brill) Causing the Bankruptcy of the BondCompany and Admissions of TCW And AIG SunAmerica

39728

43

130.     Defendant Tell, on September 19, 2001, immediately following the
September 11 terrorist events that stalled much economic activity in the United
States, told Alan Brill that he would like to do a restructuring of the BMCLLC
Companies to include other radio properties owned by Alan Brill personally, in
which restructuring TCW Group entities would control the properties of both
the BMCLLC Companies and of Alan Brill Affiliates, and in which other
Bondholders would be squeezed out. Defendant Tell stated that he had missed
the buying opportunities of the early 1990's, when a lack of financial market
funding drove the prices of radio properties to half their prior worth, and that
defendant Tell surely was not going to miss the opportunity to gain the huge
profits from equity in such properties this time around.

131.     Defendant Tell's conceptual proposal of September 19 failed to
account for the legal structure and guaranties of all of the BMCLLC
Companies for BMCLLC Bonds, the requirements of the Indenture Contract
(including those that prevented one Bondholder from obtaining a preference or
priority over other Bondholders or prejudicing other Bondholders) or the
economic injuries to other parties dealing with the BMCLLC Companies from
the proposal, all of which would be difficult or impossible to overcome. When
Alan Brill advised defendant Tell that the proposal was not feasible and that
BMCLLC might have to sell some of its properties, like the Colorado radio
stations, defendant Tell challenged Mr. Brill to go ahead and try to sell them.

132.     Over the next two months all of Alan Brill's attempts to propose
feasible alternatives, which would not give one Bondholder preference or
priority over other Bondholders and would not prejudice other Bondholders or
cause economic injuries to other parties dealing with the BMCLLC Companies,
were abruptly dismissed by defendant Tell.

133.    On November 19, 2001.defendant Tell made another conceptual
proposal to the BMCLLC Companies, which proposal was also highly
preferential to the TCW Group entities, at the expense of the other Bondholders
and of other creditors of the BMCLLC Companies and was unworkable for the
operations of the BMCLLC Companies and for Alan Brill. At a further
meeting with Alan Brill, on December 7, 2001, defendant Tell only repeated
the November 19 proposal to the BMCLLC Companies with little detail, and,
again, in response to Alan Brill's suggestion that BMCLLC might sell some
of its properties in order to meet the December 17, 2001 interest payment and
for operating capital, defendant Tell challenged Mr. Brill to go ahead and try
to sell them.

134.    Defendant Tell, at this December 7, 2001 meeting, boasted that TCW
Group entities were continuing to buy BMCLLC Bonds from other
Bondholders and would soon have control of the debt of the BMCLLC
Companies. Defendant Tell further suggested at this meeting that Alan Brill
had tax problems too deep to have any alternatives but to accept the TCW
Group entities' proposals. On information and belief, as of December 7,
2001, defendants had already agreed among themselves to force the
BMCLLC Companies into a non-curable default even though no default on
the interest payment would occur until December 17, 2001, even though no
Event of Default under the Indenture Contract would occur until thirty (30)
days thereafter, and even though no Event of Default would occur at all but
for the subsequent unlawful acts of defendants.

135.    After rejecting TCW's unworkable proposal on December 7, 2001, the
BMCLLC Companies proceeded with the process of selling some of their
properties, in order to meet the December 17, 2001 interest payment.
BMCLLC learned that the TCW Group entities, AIG SunAmerica and their
agents and representatives had begun to contact media companies with whom

Alan Brill might have had sale discussions. The TCW Group entities and,
AIG SunAmerica and their agents and representatives informed these
potential purchasers: a) that there was no reason for these potential purchasers
to have further talks with Alan Brill because he had agreed to let defendant
Tell set up a due diligence room in Los Angeles and to run the sale of the
BMCLLC Companies' radio and newspaper properties; b) that defendants
TCW Group and AIG SunAmerica entities would oppose any sale of the
BMCLLC Companies' properties without TCW Group's and AIG
SunAmerica's approval, (regardless of the fairness of the price and without
respect for the right to sell such properties under the Indenture Contract); c)
that none of these parties should consider buying any of the BMCLLC
Companies properties except through the TCW Group and AIG SunAmerica;
d) that if these parties did proceed with a purchase of BMCLLC Companies
without the TCW Group entities and AIG SunAmerica, defendants would try
to unwind the transaction, imposing substantial litigation costs and delays
even though the unwinding process would ultimately fail because it was
legally unjustified; and e) that there were additional alleged facts the TCW
Group entities and AIG SunAmerica had been given by the BMCLLC
Companies which would prevent such companies from doing such business,
making any investment in or considering any merger with the BMCLLC
Companies. Potential buyers of BMCLLC Companies' properties, investors
or joint venturers with which defendants the TCW Group entities, AIG
SunAmerica, and their agents and representatives had such communications
included, but were not limited to: NextMedia, Group, Inc. of Englewood,
Colorado ("NextMedia"); AAA Entertainment L.L.C. of Pawtucket, Rhode
Island ("AAA Entertainment"); Triad Broadcasting Company L.L.C. of
Monterey, California ("Triad Broadcasting"); and Regent Communications,
Inc. of Covington, Kentucky ("Regent Communications").

136.     The TCW Group and AIG SunAmerica and their agents and
representatives, in their contacts with NextMedia, AAA Entertainment, Triad
Broadcasting and Regent Communications, were in violation of their written
Confidentiality Agreements with the BMCLP and the Brill Media Companies
dated September 19, 2001, and October 4, 2001, using information that was not
allowed to be disclosed under the agreements and using that information for
purposes that were not allowed under the agreements. They were also
anticipatorily breaching the Indenture Contract, which allowed sales by the
Bmcllc Companies of their radio properties for fair market value.

137.     On January 2, 2002, legal counsel for defendant TCW Group entities,
Milbank, Tweed, Hadley & McCloy, LLP, contacted the Brill Media Companies
directly, by letter, although the Brill Media Companies were at the time
represented by other legal counsel on this matter and although Milbank, Tweed,
Hadley & McCloy, LLP was then representing defendant TCW Group entities
on this matter in direct conflict with the interests of the Brill Media Companies.
Milbank, Tweed, Hadley & McCloy, LLP, ("Milbank") demanded a retainer
of $100,000 from the Brill Media Companies to pay for representing a
committee of Bondholders, including defendant TCW Group entities and
defendant AIG SunAmerica and execution of an "Engagement Letter" as
conditions for entering into a forbearance agreement and, for defendant
Bondholders from forbearing in the exercise of their rights and remedies
under the Indenture Contract "in respect of [a nonexistent] Event of Default."
Milbank's representation of defendant Bondholders would be in connection
with any proposed restructuring or exchange offer concerning the BMCLLC
Notes, including in any action to effect a restructuring or to protect the
committee members' interests and rights.

138.     Milbank did not disclose to the Brill Media Companies that, as of
January 2, 2002, they were in a substantial conflict of interest with the Brill

Media Companies. The proposed forbearance agreement that Milbank, Tweed, Hadley & McCloy, LLP demanded the Brill Media Companies sign, as a condition for its Bondholders to forbear until January 15, 2002, from exercise of their alleged rights "in respect of the Event of Default that has occurred," contained a number of misrepresentations. These included that "[t]he default in the payment in interest on the Notes on December 15, 2001 [sic] (the "Acknowledged Default") constitutes a Default and Event of Default that has occurred." In fact, no Event of Default had occurred under the Indenture Contract and would not occur until, if and when the BMCLLC Companies were unable to meet the December 17, 2001 interest payment by January 16, 2002.

139.     As of December 7, 2001, the Brill Media Companies had more than one buyer which was ready, willing and able to buy radio properties owned by them and their affiliates. The Brill Media Companies settled on NextMedia as the buyer able to provide the best price and terms for the sale of the BMCLLC Companies' three Colorado radio stations and for one radio property owned by Alan Brill affiliates _____. The Brill Media Companies and their affiliate reached agreement with NextMedia for the sale of these Colorado radio stations for a cash consideration of $22.5 million and moved ahead toward closing that sale and receiving a cash payment by wire transfer on January 11, 2002, in order to make the $6.3 million December 2001 interest payment on the BMCLLC Bonds before January 16, 2002 — the end of the 30 day grace period allowed in the Indenture Contract.

140.     As a matter of historical fact, the four Colorado radio properties which were to be sold to Next Media ended up being sold in the subsequent _____ bankruptcy process. In fact, as evidenced by an order of the bankruptcy court attached hereto as Exhibit A, (handwritten summation added) the

amount allocated to the sale of those properties in bankruptcy court was $ 22 million dollars, only one-half million dollars more than would have been paid by Next Media, even though the environment for the sale of those properties was less favorable in January, 2002 than it was in August, 2002 in terms of the revenues and cash flow of those four particular properties and even though the assets of NCR IV, LLC (CP for Channel 232 C3, Wellington, Colorado) were much more developed in August of 2002 (when they were turn-key ready to begin radio operations) than they were in January of 2002 (when they largely consisted of the license and legal right to that piece of the radio spectrum). Because the entity defendants in this action, and Defendant Nick Tell specifically, held seats on and controlled the Creditor's Committee in those bankruptcy proceedings.

## L.   Brill Media Companies' Contract with NextMedia for Sale of Colorado Stations

141.     Four of the BMCLLC companies, their related successors in interest and an Alan Brill affiliate entered into agreements in early January 2002 with NextMedia for the sale to NextMedia of a total of four (4) radio stations and licenses serving the northern part of Colorado. The four BMCLLC Companies and the three radio stations whose assets and licenses were to be sold to NextMedia under these agreements were: a) Northern Colorado Radio, Inc. (KUAD-FM, Windsor, Colorado): b) NCR IV, LLC (CP for Channel 232 C3, Wellington, Colorado); c) NCR III LLC (KTRR-FM, Loveland, Colorado); and d) NCR II, Inc. These four Brill Media Companies agreed with NextMedia to the sale of these stations for a total consideration of $21.5 million cash. Additionally, at the request of NextMedia, Alan Brill agreed that an Alan Brill affiliate company would sell to NextMedia a radio station in the same market area, KKAW-FM in Albin, Wyoming, owned by TSB II, Inc., for the total consideration of $1.0 million cash. All of the material terms of these sales (jointly referred to as the "Colorado Sale") were agreed upon. The Colorado

49

Sale was set to close on Friday, January 11, 2002 for a total consideration of $22.5 million cash, which was to be paid by wire transfer on January 11, 2002.

142. The total consideration of $22.5 million from the Colorado Sale would have generated sufficient net funds for the BMCLLC Companies to make the December 17, 2001 interest payment, pay down substantial debt and provide substantial additional working capital and monies for future payments of interest on the BMCLLC Bonds.

143. The BMCLLC Colorado Sale was permitted under the terms of the Indenture Contract. The Colorado Sale was for full fair market value and was supported by an appropriate institutional investment company's "fairness opinion."

144. The BMCLLC Colorado Sale was approved, as required, by Foothill Capital Corporation ("Foothill Capital"), the lender holding secured debt senior to the BMCLLC Bonds (which debt was partially secured by liens on the assets being transferred in the Colorado Sale). Foothill Capital had also agreed upon the release of liens on the assets to be sold from the BMCLLC Companies to NextMedia and had agreed on the partial pay down from the BMCLLC Companies to them for the release of liens.

145. Appropriate filings for the Colorado Sale had been made with the Federal Communications Commission and their consent had been obtained for the transfer of the radio licenses necessary to close the sale, as planned, on January 11, 2002.

146. Bond counsel for the Indenture Contract had been consulted regarding the structure and terms of the BMCLLC Colorado Sale, the FCC approvals for the Colorado Sale and the proposed use of the funds from the Colorado Sale, and bond counsel had agreed on the propriety of the sale under the Indenture Contract.

## M. Interference With the Colorado Sale Contracts

147. Defendants and their agents and representatives knew of the potential Colorado Sale to NextMedia at least as early as December 2001 and of the

existing contractual relationships between the Brill Media Companies and
NextMedia by early January 2002. Defendants and their agents and
representatives took actions to intentionally interfere with such contractual
relationships solely for their own economic benefit and, by preventing the
closing of the Colorado Sale wrongfully to force the BMCLLC Companies into
an Event of Default under the Indenture Agreement.

148.        These actions by defendants and their agents and representatives
included, but were not limited to: a) a telephone call from defendant Tell to Sean
Stover, Chief Financial Officer of NextMedia, in which defendant Tell advised
Mr. Stover, before the January 16, 2002 expiration of the grace period for
payment of the December 17, 2001 interest payment, that there was going to be a
default by the BMCLLC Companies, that there would be a sale of the Brill
Media assets, and that he was setting up a due diligence headquarters through
TCW for such sale; b) a telephone call from defendant Ward to Steve Dinetz, the
President and Chief Executive Officer of NextMedia at his home in Lake Tahoe
in early January 2002 (while authorized representatives of NextMedia and Brill
Media were jointly at the closing table in Richmond, Virginia preparing the
closing, with authority to wire cash funds to close upon pro forma approval of
the NextMedia Board of Directors set for the next day) in which defendant Ward
advised Mr. Dinetz against closing the purchase because the California defendant
Bondholders would look seriously at unwinding the transaction; and c) a
telephone call from defendant Ward to Mr. Stover several days later, in early
January 2002, in which defendant Ward told Mr. Stover that the Bondholders
would probably oppose any deal between NextMedia and the BMCLLC
Companies and that the Bondholders thought that BMCLLC should be forced to
sell off its individual assets at this unpropitious time in the market, In these
communications, defendants and their agents and representatives also threatened
to institute proceedings for fraudulent conveyances and to interfere with the
transfer to NextMedia of any Federal Communications Commission ("FCC")
licenses which were necessary to operate these radio stations.

149.        The required FCC approvals for the transfer of stations would have
been easily obtained absent defendants' misconduct. Brill Media companies had

been in extensive discussions with the FCC for guidance in effecting the proper FCC transfer filings required for the Colorado Sale. In fact, Brill Media had already filed with the FCC short-form applications, which had been approved, to be followed (as disclosed in the short-form application) by the filing of subsequent long-form applications after the sale closed. Those approvals of the short-form applications allowed the Colorado Sale to NextMedia to close as contracted or, with timely modifications, to permit other contemplated financial arrangements between Brill Media and other Potential Buyers to close. Although the public can challenge grants of long-form applications, the success rate of such a challenge is insignificant where, as here, there would be no technical engineering violations, excess ownership or concentration violations, or evidence of moral turpitude by the ownership of the properties. Nevertheless, it was understood by the Potential Buyers that a party with the resources of California Defendants, unfettered by good faith or veracity, might be expected to make the transfer process long and arduous.

150.     As a result of these actions and others by defendants and their agents and representatives, NextMedia ultimately declined to consummate on January 11, 2002, the Colorado Sale it had agreed upon. NextMedia and its Board of Directors wanted to close the Colorado Sale and to acquire the four Colorado and Wyoming stations. However, NextMedia anticipated the possibility in the near future of taking their company public, with an initial public offering, and NextMedia decided not to complete the Colorado Sale because of the threats by defendants and their agents and representatives. NextMedia determined that the financial risks and problems to NextMedia's IPO efforts and other activities, if defendants' threats were carried out, would be too great.

151.     Because of the failure of the Colorado Sale to close on January 11, 2002, the BMCLLC Companies were unable to meet the January 16, 2002 deadline for the grace period within which to make the December 17, 2001 interest payment on the BMCLLC Bonds and were in default on the Bonds. At that point, missing the grace period deadline, BMCLLC would have to sell its assets or companies in the fairly near future to satisfy the Bondholders Defendants' demands. But 2002 was a very unfavorable time to sell such media

assets, due to the Advertising Recession. Absent defendants' misconduct, Brill
Media would have sold the assets included in the Colorado Sale or effected
other transactions in time to avoid default and keep BMCLLC running until a
more propitious time to sell assets

## N. Damages to Brill Media Properties by California Defendants in the Period of Lat 2001 and Early 2002

152.  As a matter of historical fact, on January 17, 2002, the first date on which
there was an Event of Default under the Indenture Contract for the BMCLLC
Bonds (due to the failure to pay the interest payment due December 17, 2001),
California defendant Bondholders, through their legal counsel, Milbank, Tweed,
Hadley & McCloy, LLP and local legal counsel in Indiana, filed an involuntary
bankruptcy petition against three of the BMCLLC entities. Eventually, Brill
Media's assets were subject to bankruptcy proceedings and disposed of pursuant
to the rulings of the bankruptcy court. By this complaint, Brill Media seeks in
damages the difference between what it actually received on the disposition of
its assets in terms of the amounts received and expended in the disposition and
what it would have received if it had disposed of its assets by way of the
Colorado Sale, or by an alternative financial arrangements prior to default, and a
subsequent sale of assets at a more propitious time in the market, as would have
occurred but for Defendants' misconduct as alleged herein.

153.  Because, as alleged above, the primary assets of plaintiffs were
intangible — consisting of plaintiffs' hard-earned relationships among, on the one
hand, its team managers, media talents, sales professionals, and support staff and,
on the other hand, its advertisers and other customers, listeners and readers,
market-community influencers and sources, vendors, distributors, and suppliers
— California defendants' misconduct, as alleged herein, began to have negative
consequences for plaintiffs as soon as undertaken. Beginning with the California
defendants' misconduct in interfering with Potential Buyers of plaintiffs' media
properties, such misconduct immediately raised doubt among Potential Buyers
about the financial danger to themselves resulting from involving themselves in

53

any relationship or transaction that exposed them to the consequences of the unjustified and illegal misconduct by defendants. Further, such misconduct cast doubt about plaintiffs' continuing effectiveness and viability not only in the markets for the purchase and sale of media properties but also in the business of operating such properties. Industry observers, even those uneducated in finance, perceived that defendants' misconduct, and the resulting default by plaintiffs, harmed plaintiffs' operational effectiveness and relationships. In particular, those with whom plaintiffs had such relationships changed their focus from what was in the plaintiffs' interest to what was in their own self-interest and financial survival, wondered if they should continue to do business with plaintiffs, could even collect money owing, or whether it would just be better for them to establish new relationships with other media companies, including plaintiffs' competitors. Indeed, relationships ended because of defendants' misconduct, to the detriment of the value of the plaintiff companies.

154.     As a matter of historical fact, all of the BMCLLC media assets were sold in bankruptcy court. Further, the entity defendants in this action, and Defendant Nick Tell specifically, held seats on the Creditor's Committee in the bankruptcy proceedings and indeed controlled that Committee, approved the sale of Brill Media assets, and submitted the fact of their approval to the bankruptcy court in order to obtain the bankruptcy court's approval of the sales of those assets.  On August 26, 2003.

155.     As a matter of historical fact, during August 2002, plaintiffs' BMCLLC bankruptcy estate submitted to the bankruptcy court a Motion for an Order authorizing the sale of certain radio station assets. In that motion, the estate stated that the assets would lose value if not sold at that time. That statement was true. Contrary to what has been asserted by California defendants in that action, however, there is no contradiction between that statement and the theory of liability asserted by plaintiffs here. After California defendants' misconduct, from August of 2001 until and including the termination of the prospective Colorado Sale, prospective plaintiffs' relationships with team managers, media talents, sales professionals, supporting staff, advertisers and other customers, listeners and readers, market-community influencers and sources, vendors,

distributors, and suppliers suffered, leading to declining results and values. In August of 2002, the deterioration of these relationships looked to continue such that the assets at issue would be worth even less in the future than they were in August of 2002. In the absence of defendants' misconduct, however — had plaintiffs' relationships not been unjustifiably interfered with and had plaintiffs completed the Colorado sale, for example — no such loss and harm to their relationships would have been inflicted in the first place. Rather, plaintiffs' assets and properties would have continued operating without threat to their future viability in the marketplace, allowing them to continue in operation until the Ad Recession ended, at which point the assets could have been sold at a much higher price than was obtained in actuality. Defendants misconduct is thus the proximate cause of the harm suffered by plaintiffs herein, that harm resulting in damage in the form of the difference between what plaintiffs would have obtained if they had sold their properties after the Ad Recession was over (as they planned and as they told defendants they would do) and what was obtained as a result of the sales conducted after the damage that resulted from defendants' misconduct.

## O. Regent Communications Background Relationship With Alan Brill and the Brill Media Companies.

156.    In the year 2000, Alan Brill became interested in selling the Brill Media radio stations and commenced formal efforts to do so, putting together a list of radio companies which it seemed would have a strategic fit with the Brill Media radio stations, have the means to buy them and with whom Alan Brill was comfortable in dealing as prospective buyers of his Brill Media radio stations.

157.    Defendant Regent Communications was among those prospective buyers and seemed to have a particularly good strategic fit and need for the Brill Media radios stations, and Alan Brill commenced in the spring of 2000 discussions with Regent about the possible sale of the Brill Media radio stations to Regent.

39728

158.         Prior to any meaningful discussion, on June 16, 2000, Defendant
Regent signed its first Confidentiality Agreement with Alan Brill on behalf of
Brill Media Company, LP with respect to its affiliated group of entities (all
together, "Brill Media") ("the First Regent Confidentiality Contract") which First
Regent Confidentiality Contract effectively prohibited Defendant Regent at ANY
TIME from utilizing the information thus gained with respect to the Proposed
transaction to deal with anyone else other than Brill Media Company, LP with
respect to Brill Media.

159.         Full due diligence was performed by Defendant Regent and all possible
relevant information about Brill Media, Alan Brill, the organization and the Radio
Group was delivered to Defendant Regent and discussed in detail over several
weeks or more.

160.         Defendant Regent did enter into a Letter of Intent to buy the Brill Media
Radio Stations from the Bond Company and Alan Brill at a price of
$150,000,000, and several draft of the purchase agreement were negotiated; but
finally the Proposed Transaction failed to close by reason of disagreement on the
value of Defendant Regent Stock which was being paid in partial consideration of
the purchase price. Nonetheless Defendant Regent remained bound by the First
Regent Confidentiality Contract.

161.         Alan Brill and Defendant Regent remained in contact with one another as
the Brill Media Radio Group seemed certain as strategic and compatible fit for
ownership by Defendant Regent.

**P.  The Bankruptcy Forum for the BondCompany Liquidation Which Was Forced by the
Breach of the Confidentiality Agreements By Defendants and The Resulting Unlawful
Acts Against the BondCompany By Defendants**

162.    Upon the filing of the sudden, unexpected Involuntary Bankruptcy Petition
by the Defendant Bondholders (including as agent leader Defendant Tell) on
January 17,2002, BMCLLC itself directly, and also Alan Brill and BMCLP, who
_____ desperately needed expert direction and guidance and
competent experienced Counsel specialized in advising and guiding a client in
how to proceed in the distress bankruptcy environment which it now suddenly
faced and of which it knew nothing of procedure, rights, process, needs demands
or solutions.

163.    Alan Brill and BMCLP turned for advice to Defendant H. Slayton
Dabney, Jr., Esq., then a partner of a large national law firm, McGuireWoods,
headquartered in Richmond, Virginia which had a bankruptcy practice under the
direction of Defendant Dabney.  Several months earlier under Defendant
Dabney's direction that firm had prepared for Alan Brill's benefit a study of the
tax implications of the various possible transaction solutions to the
BondCompany's post-1911 funds needs (as the tax structures and implications of
virtually all of the meaningful Brill Media companies, including those of the
BondCompany, were channeled into and consolidated in Alan Brill's personal tax
returns, and the companies themselves did not incur tax liabilities). The Tax
report prepared by McGuireWoods for Alan Brill had been competently done and
showed insight therein that led Alan Brill and BMCLP to engage Defendant
Dabney as its bankruptcy counsel for BondCompany BMCLLC in its sudden
emergency need

123.    Defendant Dabney declared that Brill Media needed local counsel familiar with
_____ to practice in Indiana and suggested the engagement of Defendant
John W. Ames a member of the law firm Defendant Greenebaum Doll and
McDonald headquartered in Louisville, KY but also practicing in Indiana and
familiar with the US Bankruptcy Court and the presiding judge to which the
BMCLLC case had been assigned.

124.   In addition Defendant Dabney and Defendant Ames suggested that the company
would need the services of a crisis management consulting firm to coordinate with
bankruptcy counsel in assisting the Company through looming this bankruptcy
crisis process. They offered the name of a firm, Defendant Bridge Associates,
and the founder and Managing Director of such firm Defendant Anthony
Schnelling, both with principal place of business or residence in New York, New
York.

125.   None of Alan Brill or the Brill Media companies had every had any dealings with
the bankruptcy process and were totally unfamiliar with it, had their hands full
already with a complicated group of companies to operate and manage and
needed skilled and competent advisors with integrity to guide them both directly
in the affairs of the BondCompany and also with the related ownership on the
BondCompany the management of the BondCompany by BMCLP and the affairs
of the Alan Brill companies in their relationship to the BondCompany.

126.   Alan Brill as CEO and sole owner of the BondCompany immediately engaged
Defendant Dabney and Defendant Ames for initial representation of the Brill
parties in the bankruptcy proceedings. Soon following that, Alan Brill, his key
BMCLP staff and members of his longtime General Counsel firm met in the
offices of McGuireWoods to have a follow-up in-person interview with
Defendant Anthony Schnelling with respect to filling the crisis management
assistance need.

127.   At that meeting in front of all parties present and with Defendant Schnelling,
Defendant Dabney and Defendant Ames sitting side by side in that order before
the rest of the group, Alan Brill expressed to them eye-to-eye from a distance of
five feet that "this bankruptcy thing is new and unknown to all of us, it is time
consuming and we already have our hands full running a good company"; "we
have never worked with you, we do not know you except for what we have just

heard, we are entering a critical process for the company's life, and we only hope we can work effectively with you if we hire you, but we don't know that for a fact".

128.    Then Alan Brill looking Defendant Schnelling straight in the eye from a distance of five feet asked Defendant Schnelling directly, "we do not really know you nor if we can work with you effectively; tell me, if we hire you, can we fire you if it does not work out?" Defendant Schnelling after some surprise and hesitation replied, "YES".

129.    Then Alan Brill looked Defendant Dabney in the eye and made the same statement and the same request; and Defendant Dabney responded with a certain "YES".

130.    Then Alan Brill looked Defendant Ames in the eye and made the same statement and the same request; and Defendant Ames responded with a certain "YES".

131.    Alan Brill hired Defendant Schnelling several days later, and on February *13*, 2002 an engagement letter was signed by Defendant Schnelling and Alan Brill under which Defendant Schnelling and Defendant Bridge Associates would represent the Bond Company as crisis management consultants and advisors to its CEO Alan Brill, seeking permission in writing among other duties and pledges to "maximize the Company's value for its stakeholder" and to "keep confidential the non-public information of the Company's affiliates".

132.    This engagement was subject to the approval of the Bankruptcy Courts which so ordered in hearing held on February 27, 2007, order being signed March 1, 2002; though Defendant Bridge and Defendant Schnelling had commenced working on site in Evansville, Indiana on February *8,*2002.

133.    Defendant Dabney's (and MaguireWoods') engagement to represent the BondCompany was entered into on January 18, 2002 and subsequent approved by

39728

59

the Court in the normal course; with work commencing immediately on January 18, 2002 under such engagement agreement.

134.   Defendant Ame's (and Defendant Greenebaum Doll & McDonald's) engagement to represent the BondCompany was entered into on January 22, 2002 and subsequently approved by the Court in the normal course; with work commencing immediately on January 22, 2002 under such engagement Agreement.

135.   In his Engagement Agreement transmittal letter to Alan Brill of January 18, 2002, Defendant Dabney indicated that Brill may want to transition representation totally over to a local counsel and he Defendant Dabney (and McguireWoods) would cooperate fully in such transition. He volunteered several times not long thereafter [in further explanation that as soon as Defendant Ames 'got up to speed', then he 'would resign in order to be your personal counsel'.

136.   In Defendant Dabney's sworn Verified Statement to the Court accompanying his (MaguireWoods') employment application with respect to 'disinterest' that the firms only prior work related to the Debtors was when employed by Debtors with respect to tax and restructuring work. In fact he, Defendant Dabney was employed on behalf of BMCLP for the benefit of Alan Brill. Additionally he swore that not in the past nor during the bankruptcy would he Defendant Dabney (and McGuireWoods) represent parties of interest or their affiliates in matters relating to the Bankruptcy of the BondCompany (contrary to his pledge to change clients)

137.   Following the Defendant Schnelling interview meeting in MaguireWoods' office, Alan Brill's long-time counsel Charles Laughlin and Christopher Malone of the firm of ThompsonMcMullen in Richmond, Virginia were commenting to each other o how that the prospective Defendant Debtors Professionals' interest in the case had zoomed as in discussions they became aware that the BondCompany generated large cash flow [from which their fees could easily be extracted].

39728

60

138.  Alan Brill set up offices for Defendant Schnelling and Defendant Bridge in offices of BMCLP not BondCompany with free access and exposure -- in full cooperation with Defendants Schnelling/Bridge and the BondCompany and the Bankruptcy -- to all of the BMCLP personnel and activities (all Non-Debtor personnel and activities). Alan Brill believed and stated to all to make it clear that Defendant Bridge could only be effective with such full access to all of the Brill Media companies, Debtor and Non-Debtor, because of their close relationships and impact on each other.

139.  In meetings called with all employees in each of the BondCompany's locations and the Non-Debtors' locations, Alan Brill or one of his senior officers of BMCLP introduced Defendant Bridge and Defendant Schnelling or Defendant Schnelling's representative and explained they were the expert consultants who would be helping the company through the bankruptcy process, and that Alan Brill asked the employees to grant to the Defendant Bridge representatives full access to them, their information and their thoughts as we could not succeed through this bankruptcy process without all being a "team".

140.  Immediately upon his employment hearing approval, Defendant Schnelling began behind Alan Brill's back his campaign to force Plantiff Alan Brill out of the BondCompany and to place himself in the BondCompany's controlling role. On the ride back to Evansville from his New Albany _____ hearing, he caught a ride alone with Alan Brill's CFO, one of Alan Brill most important and key _____ people in the Non-Debtor Organization, to whom Defendant Schnelling began [unknown by Alan Brill for a number of months] solicitations of support for himself from the CFO at the time when Alan Brill would be removed from the BondCompany and he Defendant Schnelling would take over. There were also subsequently various kinds of  similar behind-Alan Brill's back efforts

of sabotage of organizational support and weakening of Alan Brill by Defendant
Schnelling and Defendant Bridge.

141.    As the case proceeded Defendant Schnelling and other Defendant Bridge
        personnel also commenced to threaten BMCLP personnel, including Defendant
        Alan Brill but also other officers and staff), to force them to do things as
        Defendant Schnelling demanded even wrong, contrary to the companies' interests
        or in incompetent actions.  Such threats by these Defendant Officers of the Court
        commonly included threats of bringing litigation against these Non-Debtor
        personnel that would ruin them and also cause them jail time if not doing what
        Defendant Schnelling demanded, saying "if you don't do what I want, you will
        then find jail cells that have been measured for people like you".

142.    After an initial success by Defendant Debtors Professionals, Dabney and Ames in
        converting the case to a Chapter 11 case, The Defendant Debtors Professionals
        the generally, more strongly and certainly ignored the process needs of the
        Debtors and the requests, even demands of the Debtors officers and staff of
        authority, _____ and even acted contrary to requests and instruction given
        them -- all such requests and instructions reasonable and necessary, and certainly
        deserving discussion if a difference, but that was ignored.  Defendant Debtors
        Professionals made a specific point to further understand Plaintiff Alan Brill's
        confidential personal affairs including a meeting in Indianapolis requested by
        Defendant Dabney with Alan Brill's personal counsel and his CFO to go over
        Plaintiff Alan Brill's affairs  ..."so we can more effectively coordinate them for
        his benefit with the bankruptcy estate".

143.    Defendant Dabney also decided to remain as Debtors Co-Counsel and suggested
        Plaintiff Alan Brill should get his own personal bankruptcy counsel.  Plaintiff
        Alan Brill did personally engage Elliott Levin of Indianapolis and the firm of
        Rubin & Levin.

144.  From first discussions, even pre-engagement Alan Brill had made clear his desire
      to proceed with a "reorganization of the BondCompany" and offered evidence
      and plans of why and how it could succeed even if _____ a "Cram-Down
      _____. Such requests were ignored.

145.  Meanwhile particularly Defendant Schnelling, but also all the Defendant Debtors
      Professionals developed a too cozy relationship with the Defendant Petitioning
      Bondholder Creditors [now the Defendant Bondholders in the California
      Litigation] often making it difficult to determine if they were not representing the
      California Defendants as closely if not more so than their own BondCompany
      client. While there were frequent 'screams' of war between the California
      Defendants and the Defendant Debtor Professionals, it was often an act of
      Defendant Dabney's thespian theatrical skills to scream at each other to gain
      credibility for their supposed independence. Such theatrics by the skilled
      Thespian Defendant Dabney continue to date. Besides refusing to consider
      reorganization, Defendant Debtors Professionals did little if anything to try to
      advise or deflect or limit the masses of attacks and demands and distractions on
      Plaintiff Alan Brill from the California Defendants, then also immediately sought
      to ignore Plaintiff Alan Brill's demands for litigation against the California
      Defendants sabotaging the question early and as such efforts took some substance
      anyway, to join the Defendants–to-be in seeking to sabotage such litigation before
      the court and in the process after it was approved.

146.  Meanwhile Defendant Debtors Professionals sought to render Plaintiff Alan Brill
      impotent in respect to matter of the BondCompany before the court and seeking to
      force a sale of the assets without any regard for the possibility of reorganization.

147.  Defendant Debtors Professionals with Defendant Tell collaboration wasted two
      months of the Debtors' 90 day exclusive period to offer a plan for the bankruptcy
      estate; and when after being confronted in writing as all else had failed, by

Plaintiff Alan Brill on March 18,2002, of their dereliction of duty (at best), Defendant Debtor Professionals then took the step they had been planning to remove Plaintiff Alan Brill from the Company and appoint Defendant Schnelling as the Bankruptcy Administrative Officer (BAO) essentially a trustee, with promises of cooperation and _____ to Plaintiff Alan Brill in the sale process and as it might also involve his Non-Debtor properties.

148. On Plaintiff Alan Brill's resistance to their demands, Defendant Dabney threatened that "if you don't do what we ask, we will go the court and tell the judge that you are uncooperative and you will loose everything" -- these the 'Honorable' Defendant Debtors Professionals who had looked Plaintiff Alan Brill in the eye pre-engagement- and told him unqualifiedly that "YES", to his question "if I hire you, can I fire you?".

149. Alan Brill believed if they had true differences with him (for which there was in fact no basis in the interest of the BondCompany nor the Non-debtors nor Plaintiff Alan Brill himself), then the Defendant Debtors Professionals' only option was to resign.

150. However at that time with pressure, risk, and lack of knowledge of the whole process and how it works and with the threat, now having demonstrated willingness to not just threaten but act adversely, under threats of Defendant Debtors Professionals, Plaintiff Alan Brill agreed to a shift in roles with Defendant Schnelling becoming the BAO and Brill stepping back but not gone and promises by Defendant Debtor Professionals of cooperation and consultation with and from Plaintiff Alan Brill.

151. With such room, and the support of Defendant Tell and actions of Defendant Tell also, their efforts mounted to total exclusion of Plaintiff Alan Brill from the BondCompany decisions and voice in Court processes and in the then sale process that Defendant Debtors Professionals and Defendant Tell dictated, even to his

penalty to be excluded in the sale process as a buyer and also even in efforts to force his personal properties into their controlled sale, interfering with Plaintiff Alan Brills efforts to construct resolution transactions outside the Bankruptcy, to mount partnerships to argue in the bankruptcy or even to have partnerships by which he might participate in what had clearly become a BondCompany solution by Auction sale of its properties, using as much as anything waves of court filings and proceedings against Plaintiff Alan Brill to stall and standstill his activities out. Such massive attacks of Defendant Debtors Professionals and Defendant Tell had enormous drains on Plaintiff Alan Brill 's and the Non-Debtors'; even outside the BondCompany, in finances, resources, their creditability, their available time and their energy.

152.    It was in late April of 2002 with the addition of Howard Siegel and Bill Magee to join the Non-Debtors Alan Brill team [Siegel being a lawyer specializing in Bankruptcy with the firm of Israel   and Magee a trusted investment banker advisor), that in the new court hearings some of the prior determinations in favor of the Defendant Debtors Professionals direction and Defendant Tells direction (ostensibly on behalf of as the Creditors committee) were reheard and overturned and in late May the Judge made clear in his court that Mr. Brill can do anything he wants with his personal assets, and in his Order that "Nothing ... shall in any way restrict the ability of Alan Brill to act on his behalf of his interests as a owner and/or creditor of the Debtors." . The Order also made clear that Alan Brill could participate in the Sale of the Debtors properties as a buyer and ground rules were set forth by which his participation would be protected. However almost five months had been wasted, Alan Brill had been weakened and his creditability greatly weakened if not destroyed with potential resolution partners, and the Defendant Debtors Professionals and Defendant Creditors in partnership with the Defendants Debtors Professionals had solidified their own

65

direction and momentum, which was not in the interest of the BondCompany nor as well as of Alan Brill, either organization, the general creditors, the employees, nor the communities in which the businesses served.

153.    While Plaintiff Alan Brill had some rights restored and a more specified path with which to deal with encouraging potential partners and support, nonetheless the Defendant Debtors Professionals and Defendant Tell continued however they could to weaken Alan Brill's efforts, more so than to strengthen their own on behalf of the Estate.

154.    The Defendant Debtors Professionals and Defendant Tell then set forth with a plan for an Auction of the BondCompany's radio stations and newspapers in the key step of liquidating its estate; Alan Brill was forced to withdraw his opportunity to file a plan even if he won the Auction, and he was able to but limited only to participate in the Auction as another independent buyer – assuming he could financially qualify under the requirements that had been set by the Defendant Debtor Professionals for a potential buyer to be "qualified". In his case, that required that he obtain a financial partner who had the means to present that qualification on his behalf to the Defendant Debtor Professionals and Defendant Tell.

155.    Alan Brill had reconciled himself to loss of the radios stations though that was also his positioning plan in the year 2000 when he was attempting to sell them for $150,000,000. However then as in the now present Bankruptcy context, he saw the sale of the radio stations as the means by which he would retain/obtain the reasonable ownership of the Newspaper Group now of the Debtors. His present more complex means to do that was possible because of his ownership outside of the bankruptcy of his valuable Non-Debtor radio stations in Pennsylvania and

Evansville markets and Wyoming. With which he planned to try to trade with a radio-buying partner for the Newspapers they would acquire along with the Debtors radio Stations from the BondCompany Estate on winning the BondCompany Bankruptcy Auction. He hoped and greatly expected that he and a partner together, using his partner's money, would win the bidding for all the BondCompany radio stations and Newspapers. The he would trade his personal radio stations for the newspapers acquire in the auction by him and his partner; he would have the newspaper he wanted and the partner would have all the radios group complete that he wanted.

156.  Defendant Debtors Professionals by their inefficient, greedy and unquestioned wrongful actions managed to extract fees and expenses form the Bankruptcy Estate that approach, if not exceed, $30,000,000.

164.

## Q.  The Bankruptcy Process, and Abuse and Wrongful Acts against Alan Brill and the Alan Brill companies [as well as BondCompany] by Defendants Debtors Professionals and Tell

165.  $7 Million range.

## R.  The Second Regent Confidentiality Contract and Partnering with Alan Brill and the Non-Debtor Companies to Win the Bankruptcy Auction

157.  Defendant Regent remained Plaintiff Alan Brill's prime target for an auction partner by the sheer logic of the combination of the radio stations for Regent, and the fact that the Defendant Debtors Professionals and Defendant Tell had burned off Defendant Regents interest in the whole process and working with the Defendant Debtors Professionals and Defendant Tell in their process to secure a Stalking Horse buyer to lead the sale bidding for the radio group of the Debtors,

the Stalking Horse usually thought of as having the inside and the best shot to being the winner of the bidding.

158.   However the Defendant Debtors Professionals and Defendant Tell after making Defendant Regent feel that it had been promised that role, awarded it to another party, Saga Communications, without even communicating about their decision to Defendant Regent.

159.   Defendant Regent was bitter, after all their efforts and promises on learning of their exclusion, always having been wary of dealing in the complicated and dangerous and unknown wasteful bankruptcy assets purchase areas ... especially with assets such as radio stations whose value is largely reflective of an effectiveness of a human organization rather than hard assets or market monopoly, any value being able to quickly evaporate in radio stations thought to be successful if suddenly changes or uncertainties of fears cause a break up or flight of key elements of that valuable human organization.

160.   Defendant Regent withdrew from any further participation or communication with Defendant Debtors Professionals, Defendant Tell or even Plaintiff Alan Brill and the key person Defendant President Terry Jacobs went to the family home in the Carolinas and would not take calls.

161.   Nonetheless Plaintiff Alan Brill continued steady efforts to communicate with Defendant Jacobs, finally reached him and after several weeks of discussion talked him into bringing Defendant Regent back into the_____Deal as an Auction partner with Alan Brill and upon execution of an additional pertinent confidentiality Agreement between them.

162. the Auction had been set forth to commence on _____ August 20, 2002 and proceed around the clock until a high bidder(s) had been determined for the radio group the Newspaper group or the combined group.

163. After much difficult negotiation the additional Confidentiality Agreement (the "Second Regent Confidentiality Contract") was signed enthusiastically on July 10, 2002. The issues that presented themselves were the resulting total exclusion of Regent to do anything in the process of the BondCompany matters without acting in concert and with the consent of Alan Brill and his Non-Debtor Affiliates and including prohibition of any discussion with the Defendant Debtors Professionals or Defendant Tell, etc. without Plaintiff Alan Brill's _____ consent and participation.

164. For a long time even before this negotiation, Defendant Regent's position had been strongly articulated that it would not waste its time in playing in the BondCompany transactions unless as a partner with Plaintiff Alan Brill with whom they must have a right to acquire his Non-Debtor radios stations in the partnering process if successful. The exchange element on partnering success was always acceptable to Plaintiff Alan Brill. Nonetheless the overall restrictiveness of the _____ confidentiality contract left Defendant Regent hesitant. The parties together and separately among Defendant Jacobs, Defendant Regent's counsel, Defendant Regent CFO, Defendant Regents investment bankers, Siegel and Magee and Brill, always came back to the point that if Defendant Regent is not going to participate at all, anyways without partnering with Alan Brill and with a commitment of Alan Brill's radio stations, then what does it matter to Regent if it signed a very restrictive agreement; for under that argument to themselves and that representation to Plaintiff Alan Brill, Magee and Siegel they would not be

participating anyway in any manner without the _____ agreement which would have be_____ the only way to be Alan Brill's Partner. Therefore articulating and representing its "nothing to lose position", Defendant Regent signed the second _____Agreement as it is.

165.   There were two key element of the agreement to restrict Defendant Regent of acting against its partner of benefit in the_____, Alan Brill and the Non-Debtors Affiliates. The first element was explicit prohibition of Defendant Regent _____ to use the Information gained in considering the Transaction in a manner that would damage Plaintiff Alan Brill and the Non-Debtor affiliates in any way _____. Because Alan Brill and his advisors were unsure of how the transactions with the BondCompany might shake out and the unknown moves surely contemplated by the Defendant Debtors Professionals and Defendant Tell to stymie Plaintiff Alan Brill's possible success, the Transaction term used in the agreement was very broad to encompass any kind of form that might be tactical or strategic or practically used in Defendant Regents possible acquisition of the BondCompany or Non-Debtors properties, even to the degree that they might seek to act alone which form would obviously require the partnering consent of Plaintiff Alan Brill.

166.   Secondly because of the Defendant Debtors and Defendant Tell's adverse wrongful efforts with malice to stymie any effectiveness by Plaintiff Alan Brill in this whole Bankruptcy related environment, Defendant Regent agreed after much negotiation that it would not communicate with Defendant Debtors Professionals or Defendant Creditor Committee representatives or their representatives without the prior _____written consent of Alan Brill and his participation along with Regent. This was a sore point with Defendant Regent including the possibility of unintended communication initiated by the other side. In the end Defendant Regent again articulated its previously presented reasoning that if they did not

partner with Plaintiff Alan Brill they would not be playing anyway, so there was
no reason to try to protect any other avenues in dealing with the BondCompany.

167.    After signing the_____Confidently Agreement Defendant Regent
then decided that it still did not want to play in the unwieldy auction, but wanted
to be efficient and cut losses by going straight to the Creditors Committee to
negotiate a purchase deal with Defendant Nick Tell that would settle the sale on
the Regent/Brill partnership's behalf in place of the auction and eliminating the
inefficient, uncertainty and financial and other costs of their participation in the
auction process. Plaintiff Alan Brill agreed to that negotiation. That Negotiation
took place toward the end of July with the auction then scheduled only *10* days
later. Defendant Tell received a favorable offer, more than was finally obtained
in the Auction, but Defendant Tell refused it in order to proceed with the Auction
and also to deprive Plaintiff Alan Brill of the settlement benefit of getting what he
desired, the newspapers.

## R.  The Regent's Withdrawal From Further Participation in the Bankruptcy Sale Process

168.    With failure of the direct purchase effort, then Defendant Regent again decided
that they did not want to play in the auction and represented that they were
through, gone and no longer partnering with Alan Brill as they would not be a t
the auction in any case. Despite this determination by Defendant Regent, the
Confidentiality agreement by its terms remained effective in restricting Defendant
Regent from causing any harm to Brill for an additional two years.

169.    Alan Brill and the Non-Debtor Affiliates were then forced to scramble to find a
new auction partner for a large complicated arrangement.

S.   The Replacement Auction-Partnering contract between by Alan Brill with Cumulus Media, Inc.

I.

170.   In scrambling to find a new Auction Partner after the disappointment of the much counted on Regent Partnership, Alan Brill revived earlier discussion he had had with Lew Dickey, President of Cumulus Media, another and larger publicly traded radio station company also operating significantly in compatible markets with the Brill Media radio stations.

171.   In a difficult time bound negotiation Cumulous and Alan Brill did by the Auction qualification deadline end into a n auction partnership between then and plans and commitment to proceeded on the basis of the funding by Cumulus and, success in the auction the trade of the acquired Newspaper group for the Alan Brill Non-Debtor Radio stations.

172.   A major element of the partnering contract was the provision that the in the Newspaper Radio exchange the Non-Debtor Radio Stations would be valued at the Value that was to be determined to have been paid for in the Auction for the BondCompany Newspaper Group. Alan Brill' radio stations' value equals the Newspaper group value.

173.   Lew Dickey, Cumulus, its counsel, Alan Brill, his key officers and staff, Howard Siegel, Elliott Levin and Bill Magee all convened at eh auction August 20, 2002 as a team to expect to with the auction bidding, which results would be finalized and confirmed in an Approval hearing of the Bankruptcy Court soon after the auction complet5e.

174.   The Brill Partnership expected that it could win because there was only one other Newspaper bidder and the presumed radio stalking horse bidder had refused to ever enter into an agreement with the Bankruptcy estate and was presumed would not bee there. The Defendant Debtors Professionals and Defendant Tell had had

great trouble obtaining other bidders, even though the properties were very attractive because of their abrasive and untrustworthy style with potential buyers and the uncertainty of a major project to participate in when there was uncertainly about the state of the properties being offered for sale and in bankruptcy none of the normal representations and warranties as to many crucial elements and conditions of the properties and operations that a buyer would critically expect in a conventional purchase transaction; In a bankruptcy sale the transaction is clearly on a "Buyer Beware" basis and no comeback on the seller. The Brill /Regent Partnership had merely to outbid the combined bids of the unknown, if any, radio station group bidder and the known newspaper group bidder who had already set their staking horse bid, though that could be elevated.

## T.    The Bankruptcy Liquidation Auction of BondCompany Radio Stations and Newspapers

175.    To its surprise on arriving at the Auction, The Brill/Cumulus parties discovered that Saga had come to the auction though not as a stalking horse but just as a minimal bidder. Of greater surprise was that Defendant Regent had appeared on its own behalf as a bidder despite not coordinating with Alan Brill and despite the specific effective prohibitions of the confidentiality agreement against the participation against Alan Brill; but sure any bidding against Alan Brill partnership would be damaging to the extent that it forced the raising of the Alan Brill partnership bid or the potential loss altogether in the end.

176.    In fact the cumbersome auction process took three days. Saga immediately dropped out on its initial low bid, not wanting to risk more and even showing up only on the faint possibility of a possible basement bargain price developing that they could take advantage of. Defendant Regent did bid up for an equally low

bid, but the flavor changed and the Defendant Debtors Professionals and Defendant Tell maneuvered the Newspaper bidder and Defendant Regent into a bidding partnership of their own. In the end using private stock of the newspaper bidder to bid up the price, the Defendant Regent/21stCentry Bidding Partnership made the high bid, the Brill/Cumulus bid going $10 Million above the bid maximum that the Cumulus board had given Lew Dickey, but which he bid anyway. The Brill/Cumulus party believed their were incorrect determinations in the bidding valuation and reserved the winning determination until the arguments could be made in the Approval Hearing to be held on August 26, 2002 in the New Albany, Indiana Bankruptcy Court having jurisdiction over the BondCompany Bankruptcy.

177.    The bidding and proceeding were all charted and the proceedings transcribed and all were made a part of the formal bankruptcy record. The valuation given to the newspaper in the bidding that was then determined to be highest was $56 Million.

178.    The results, valuations and the Defendant Regent win were determined in the approval hearing in the Bankruptcy Court in New Albany Indian on august 26, 2002 for which an order was signed by the presiding judge on August 26, 2002 at which time the Alan Brill Plaintiffs lost there expectations for its rightful win in the Auction and the benefits due it there from and lost the practical means of obtaining other benefits and injury reductions which the Alan Brill Plaintiffs rightfully y had and were by the results of this hearing wrongfully denied and thereby damaged at this time .

## U.   Newspaper Group and Non Debtor Radio Group Valuation Determinations; and Brill Media Damage Determination, Recognition and Validation

179.    The Approval Hearing held in the Bankruptcy court in New Albany, Indiana on August 26, 2002 determined that in fact the bid submitted by the Defendant

Regent /21st Century bidding alliance was the high and winning bid. , And that the Newspaper Valuation of $56 Million was accepted and put to record. Such determination was won specifically on the adamant testimony by Defendant Tell for the valuations and consideration that had been bid as he represented the Unsecured Creditors and the Bondholders. Obviously the Defendant Debtors Professionals were adamant too in their supporting testimony for the results that they had achieved in the auction.

180. Though the Newspaper bid valuation included consideration that privately held stock and subject to valuation assessment not so easily determined as cash would have been, nonetheless within months after the Auction the stock was redeemed by the offerer at greater than the auction valuation price and such conversion to cash left cash proof of the newspaper valuation at least at the $57 Million level, though outside of bankruptcy it would have been expected to bring substantially more.

181. Alan Brill/Cumulus party was forced to accept the Approval Hearing determination as the conclusion to the Auction and not in their favor. Cumulus and Alan Brill and his affiliates then went their separate ways,

182. Subsequently after much patient professional marketing of the properties, Alan Brill sold to different private buyers his Non-Debtor Radio Stations for a total consideration of approximately $36 million.

183. According to the Contract Alan Brill had with Cumulus Media for the Exchange Transaction on winning the Auction, he would have ended up with the Newspaper group valued at $57 Million in exchange to Cumulus for his Non-Debtor Radio Stations which were determined to be valued at $36 Million in professionally marketed arms-length cash transactions.

184. The failure of the Brill /Cumulus partnership to win the Auction bidding thereby resulted in a loss to Alan Brill over $20 Million. To further support the difference

in Values, the Newspaper group that he would have acquiired generated annual cash flow in the $7Million range, but the radio stations that he would have given up, their annual cash flows were only slightly over $2 Million.

## V. Further interfering actions by Tell

185.   Totally consistent, even a copy of the wrongful actions for which he is a California Defendant in the California Litigation, Defendant Nicholas Tell, Jr., Esq. also called up the Buyer in Evansville of one of Alan Brill's Non-Debtor Stations and threatened that buyer with the same economic destruction and loss threats that he had used successfully against otherwise willing buyers in causing the default of the BondCompany and now its resulting liquidation with his tortuous interference with contracts and with economic relationships and with misrepresentation and fraud an other wrongful acts that Defendant Tell seems to find easy to perform even in the face of possible formal complaint against him for those actions.

186.   Defendant Tell made such threats for the eventual benefit of Defendant Regent who would then be the buyer and be able to fill out its attractive Evansville Indiana market radio combinations and also weaken the other strong competitor who was stronger with the additional Alan Brill radios stations.

187.   That buyer though totally surprised by the threats, and scared, nonetheless refused to be moved by the Defendant Tell threats and proceeded with the transaction with Alan Brill.

## FIRST CAUSE OF ACTION

(Breach of Written Contract -- First Regent Confidentiality Contract)
(Against Regent, Jacobs and Agents)

188.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

189.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

### SECOND CAUSE OF ACTION
(Breach of Written Contract -- Second Regent Confidentiality Contract)
(Against Regent, Jacobs and Agents)

190.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

191.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

### THIRD CAUSE OF ACTION
(Breach of Oral Promises -- Oral Partnering Promises)
(Against Regent, Jacobs and Agents)

192.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

193.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

194.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### FOURTH CAUSE OF ACTION

39728

(Breach of Implied Covenants of Good Faith and Fair Dealing in Contracts, Written and Oral)
(Against Regent, Jacobs and Agents)

195.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

196.  Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

197.  Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### FIFTH CAUSE OF ACTION
(Fraud and Misrepresentation   -- Partnering Relationship with Brill)
(Against Regent, Jacobs and Agents)

198.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

199.  Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

200.  Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### SIXTH CAUSE OF ACTION
(Breach of Implied Covenants of Good Faith and Fair Dealing in Promises, Written and Oral)
(Against Regent, Jacobs and Agents)

201.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

39728

202.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

203.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## SEVENTH CAUSE OF ACTION
(Intentional Interference with Contract  -- Alan Brill Parties/Brill Bankruptcy Estate)
(Against Regent, Jacobs and Agents, Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

204.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

205.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

206.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## EIGHTH CAUSE OF ACTION
(Intentional Interference with Economic Relations -- Alan Brill Parties/Brill Bankruptcy Estate)
(Against Regent, Jacobs and Agents Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

207.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

208.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

209. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## NINTH CAUSE OF ACTION
(Intentional Interference with Contract -- Alan Brill Parties/Cumulus)
(Against Regent, Jacobs and Agents Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

210. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

211. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

212. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TENTH CAUSE OF ACTION
(Intentional Interference with Economic Relations -- Alan Brill Parties/Cumulus)
(Against Regent, Jacobs and Agents Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

213. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

214. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

215. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## ELEVENTH CAUSE OF ACTION
Negligent Interference with Contracts and Economic Relations -- Alan Brill Parties/Cumulus and Alan Brill Parties/Brill Bankruptcy Estate S)

39728

80

(Against Regent, Jacobs, Regent Agents, Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

216.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

217.  Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

218.  Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### TWELFTH CAUSE OF ACTION
(Combinations To Injure Alan Brill Parties in Regent Contracts, Brill Bankruptcy, Cumulus)
(Against Regent, Jacobs, Regent Agents, Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

219.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

220.  Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

221.  Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### THIRTEENTH CAUSE OF ACTION
(Breach of Written Contract – Indenture Contract)
(Against Bondholders, TCW General Partners, AIG SunAmerica)

222.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

223.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

## FOURTEENTH CAUSE OF ACTION
(Breach of Written Contract – Confidentiality Contracts)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

224.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

225.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

## FIFTEENTH CAUSE OF ACTION
(Breach of Implied Covenant of Good Faith and Fair Dealing in Indenture Contract)
(Against Bondholders, TCW et al and AIG et al)

226.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

227.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

228.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## SIXTEENTH CAUSE OF ACTION
(Breach of Implied Covenant of Good Faith and Fair Dealing in Confidentiality Contracts)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

229.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

230.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and

promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

231. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## SEVENTEENTH CAUSE OF ACTION

(Intentional Interference With Contract – Indenture Contract)
(Against TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

232. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ____ and those that may follow hereon.

233. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

234. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## EIGHTEENTH CAUSE OF ACTION

(Intentional Interference With Contract – NextMedia Sale Contract)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

235. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ____ and those that may follow hereon.

236. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

237. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## NINETEENTH CAUSE OF ACTION

(Intentional Interference With Economic Relations – Trustee and Bondholders)
(Against TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

238. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ____ and those that may follow hereon.

239. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

240. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTIETH CAUSE OF ACTION

(Intentional Interference With Economic Relations - NextMedia)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

241. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

242. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

243. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-FIRST CAUSE OF ACTION

(Intentional Interference With Economic Relations – Other Media Companies)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

244. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

245. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

246. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-SECOND CAUSE OF ACTION

(Negligent Interference With Contract and Economic Relations)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

247. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ____ and those that may follow hereon.

248. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

249. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-THIRD CAUSE OF ACTION

(Intentional Interference With Contracts – Regent Contracts)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

250. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through _____ and those that may follow hereon.

251. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

252. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-FOURTH CAUSE OF ACTION

(Intentional Interference With Economic Relations – Alan Brill Parties/Regent)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

253. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ____ and those that may follow hereon.

254. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

255. Among other bases, this Cause of Action stands on theory of Promissory Estoppel..

## TWENTY-FIFTH CAUSE OF ACTION

(Negligent Interference With Contracts and Economic Relations – Alan Brill Parties/Regent)

39728                                                                        85

(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

256. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

257. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

258. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-SIXTH CAUSE OF ACTION

(Fraud and Misrepresentation to Regent RE Alan Brill Parties and Alan Brill/Regent contracts and Economic Relations in Inducing Regent to Breach Contracts, Promises and Representations to Alan Brill Parties of Written Contract First Regent Confidentiality Contract)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

259. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

260. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

261. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-SEVENTH CAUSE OF ACTION

((Intentional Interference With Contract – South Central Sale Contract)
(Against Tell, Schnelling, Dabney, Ames, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

262. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

39728

263.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

264.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-EIGHTH CAUSE OF ACTION

(Intentional Interference With Economic Relations – Alan Brill Parties/South Central)
(Against Tell, Schnelling, Dabney, Ames, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

265.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

266.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

267.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## TWENTY-NINTH CAUSE OF ACTION

(Negligent Interference With Contracts and Economic Relations – Alan Brill Parties/South Central)
(Against Tell, Schnelling, Dabney, Ames, TCW General Partners, AIG Sun America, TCW Group, TAMCO, TIMCO, Tell and Ward)

268.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

269.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

270.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### THIRTIETH CAUSE OF ACTION
(Combinations To Injure Alan Brill Parties in South Central Contract and Economic Relations
Regent Contracts, Brill Bankruptcy, Cumulus)
(Against Tell, Schnelling, Dabney, Ames, TCW General Partners, AIG Sun America, TCW
Group, TAMCO, TIMCO, Tell and Ward)

271.　Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

272.　Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

273.　Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### THIRTY-FIRST CAUSE OF ACTION
(Fraud and Misrepresentation RE Alan Brill Parties to South Central in Inducing Regent to
Breach Contracts, Promises and Representations to Alan Brill Parties of Written Contract First
Regent Confidentiality Contract)
(Against Schnelling, Dabney, Ames, Tell, TCW General Partners, AIG Sun America, TCW
Group, TAMCO, TIMCO, Tell and Ward) (Against Regent)

274.　Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

275.　Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

276.　Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### THIRTY-SECOND CAUSE OF ACTION

(Breach of Written Contract – Bridge Engagement Contract)
(Against Schnelling, Bridge)

277.   Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon. Damages upon Plaintiffs for such wrongful
actions by Defendants, knowingly made further with malice, oppression, intent,
aforethought, misrepresentation and promises, written and oral, and other
elements aggravating such wrongs, are in excess of $20 Million.

278.   Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### THIRTY-THIRD CAUSE OF ACTION

(Fraud and Misrepresentation to Alan Brill and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Schnelling,)

279.   Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

280.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

281.   Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### THIRTY-FOURTH CAUSE OF ACTION

(Fraud and Misrepresentation to Alan Brill and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Bridge)

282.   Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

39728

283.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

284.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## THIRTY-FIFTH CAUSE OF ACTION

(Fraud and Misrepresentation to Alan Brill and Brill Media Companies of Terminability of Prospective Contract and Relations)
(Against Dabney)

285.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

286.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

287.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## THIRTY-SIXTH CAUSE OF ACTION

(Fraud and Misrepresentation to Alan Brill and Brill Media Companies of Terminability of Prospective Contract and Relations)
(Against Ames)

288.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

289.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

290.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

39728

## THIRTY-SEVENTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Schnelling)

291.   Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

292.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

293.   Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

## THIRTY-EIGHTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Terminability of
Prospective Contract and Relations)
(Against Bridge)

294.   Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

295.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

296.   Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

39728

91

## THIRTY-NINTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Terminability of Prospective Contract and Relations)
(Against Dabney)

297. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

298. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

299. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FORTIETH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Terminability of Prospective Contract and Relations)
(Against Ames)

300. Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

301. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

302. Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FORTY-FIRST CAUSE OF ACTION

(Fraud and Misrepresentation of Independence)
(Against Dabney)

39728

92

303.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

304.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

305.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.


## FORTY-SECOND CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Cooperation and Consultation)
(Against Schnelling, Bridge, Dabney, and/or Ames)

306.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

307.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

308.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.


## FORTY-THIRD CAUSE OF ACTION

(Fraud and Misrepresentations Regarding Confidentiality to Alan Brill and Brill Media Companies in Private Affairs of Alan Brill and Alan Brill Parties)
(Against Dabney)

309.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

310. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

311. Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### FORTY-FOURTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Confidentiality in
Private Affairs of Alan Brill and Alan Brill Parties)
(Against Dabney)

Breach of Written Promises to shift representation

312. Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

313. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

314. Among other bases, this Cause of Action stands on theory of Promissory
Estoppel.

### FORTY-FIFTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Cooperation and
Consultation)
(Against Schnelling, Bridge, Dabney and/or Ames)

315. Plaintiffs refer to, and by that reference incorporate and reassert in the present
cause of action each of the allegations contained in the paragraphs 1 through ___
and those that may follow hereon.

316. Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly
made further with malice, oppression, intent, aforethought, misrepresentation and
promises, written and oral, and other elements aggravating such wrongs, are in
excess of $20 Million.

317.    Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FORTY-SIXTH CAUSE OF ACTION

(Fraud and Misrepresentations against Alan Brill and Alan Brill Parties regarding shift in representation.)
(Against Dabney)

318.    Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

319.    Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

320.    Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FORTY-SEVENTH CAUSE OF ACTION

(Breach of Oral Promises made to Alan Brill and Brill Media Companies of Representation Shift)
(Against Dabney)

321.    Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

322.    Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

323.    Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

39728

### FORTY-EIGHTH CAUSE OF ACTION
(Fraud and Misrepresentation and Abuse of Authority, or perception or presentation of authority thereof, Criminally, Professionally and Civilly including various threats and acts of intimidation made from time to time on Alan Brill and Alan Brill Non-Debtors' Personnel)
(Against Schnelling)

324.    Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

325.    Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

326.    Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### FORTY-NINTH CAUSE OF ACTION
(Fraud and Misrepresentation and Abuse of Authority, or perception or presentation of authority thereof, Criminally, Professionally and Civilly including various threats and acts of intimidation made from time to time on Alan Brill and Alan Brill Non-Debtors' Personnel)
(Against Bridge)

327.    Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

328.    Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

329.    Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

### FIFTIETH CAUSE OF ACTION
(Fraud and Misrepresentation in Seeking to Advise Alan Brill and Alan Brill Parties)
(Against Ames)

39728

96

330.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

331.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

332.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FIFTY-FIRST CAUSE OF ACTION

(Fraud and Misrepresentation and Abuse of Authority, or perception or presentation of authority thereof, Criminally, Professionally and Civilly including various threats and acts of intimidation made from time to time on Alan Brill and Alan Brill Non-Debtors' Personnel)
(Against Dabney

333.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

334.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

335.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FIFTY- SECOND CAUSE OF ACTION

(Fraud and Misrepresentation and Abuse of Authority, or perception or presentation of authority thereof, Criminally, Professionally and Civilly including various threats and acts of intimidation made from time to time on Alan Brill and Alan Brill Non-Debtors' Personnel)
(Against Ames)

336.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

337.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

338.   Among other bases, this Cause of Action stands on theory of Promissory Estoppel.

## FIFTY- THIRD CAUSE OF ACTION

(Violation of Virginia Code SS 18.2-499 and 18.2-500 combinations to Injure in matters of late 200 and early 2001)
(Against Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward)

339.   Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

340.   Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

## FIFTY-FOURTH CAUSE OF ACTION

(Violation of Virginia Code SS 18.2-499 and 18.2-500 combinations to Injure in matters of Alan Brill and Alan Brill affiliates as Non-Debtors

(Against Regent, Schnelling, Bridge, Dabney, Ames, Tell, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, and TIMCO)

341.  Plaintiffs refer to, and by that reference incorporate and reassert in the present cause of action each of the allegations contained in the paragraphs 1 through ___ and those that may follow hereon.

342.  Damages upon Plaintiffs for such wrongful actions by Defendants, knowingly made further with malice, oppression, intent, aforethought, misrepresentation and promises, written and oral, and other elements aggravating such wrongs, are in excess of $20 Million.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray judgment against defendants and each of them damages sustained by plaintiffs as set forth below.

(1) Compensatory damages exceeding Seventy-Five Million Dollars ($75,000,000), according to proof at trial against the defendant Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward in the matter of late 2001 and early 2002 related to matters reflected in the California Litigation and set forth herein in with respect to such defendants in damages to Plaintiffs.

(2) Compensatory damages Exceeding Twenty Million Dollars ($20,000,000), according to proof at trial against the defendants Regent , Jacobs, Debtors Professionals, Tell, Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, and Ward

39728

(3) Compensatory damages exceeding Twenty Million Dollars ($20,000,000), according to proof at trial against the Defendant Debtors Professionals.

(4) Three-fold the compensatory damages sustained by plaintiffs, exceeding Seventy-Five Million Dollars ($75,000,000) before trebling, according to proof at trial, against defendant Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, Tell and Ward, pursuant to Virginia Code § 18.2-500

(5) Three-fold the compensatory damages sustained by plaintiffs, exceeding Twenty Million Dollars ($20,000,000) before trebling, according to proof at trial, against Regent , Jacobs, Debtors Professionals, Tell, Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, and Ward, pursuant to Virginia Code § 18.2-500;

(6) Punative damages as may be granted at trial in respect to the egregiously wrong actions in these matters resulting in damages stated above and in damages exceeding at least One Million Dollars ($1,000,000) in any other matters in any case, against Regent, Jacobs, Debtors Professionals, Tell, Bondholders, TCW General Partners, AIG SunAmerica, TCW Group, TAMCO, TIMCO, and Ward.

(7) For such other and further relief as the court deems just and proper in the premises.

39728

100

Dated: August 21, 2008

By_____
  Alan R. Brill

## NATIONAL REGISTERED AGENTS, INC.

### SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  MICHAEL E. CAHILL, ESQ.
TRUST COMPANY OF THE WEST
865 S. FIGUEROA ST., SUITE 1800
LOS ANGELES, CA 90017-

SOP Transmittal # CA61045

(800) 767-1553 - Telephone
(609) 716-0820 - Fax

Entity Served: TCW SHARED OPPORTUNITY FUND III, L.P.

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of     CALIFORNIA     on this  28  day of     August    ,  2008  . The following is a summary of the document(s) received:

1.  **Title of Action:** Alan R. Brill, et al. v. Shared Opportunity Fund IIB LLC, et al.

2.  **Document(s) served:**

| | | |
|---|---|---|
| x Summons | ___ Subpoena | ___ Injunction |
| x Complaint | ___ Third Party Complaint | ___ Notice of |
| ___ Petition | ___ Demand for Jury Trial | ___ Mechanics Lien |
| ___ Garnishment | ___ Default Judgment | ___ Other: |

3.  **Court of Jurisdiction/**  Vanderburgh County Superior Court, State of Indiana
    **Case & Docket Number:** 82D03-0808-PL-04636

4.  **Amount Claimed, if any:** Please See Attached

5.  **Method of Service** (select one):
    ___ Personally served by:  ___ Process Server       ___ Deputy Sheriff       ___ U. S Marshall
    x Delivered Via:   x Certified Mail        ___ Regular Mail        ___ Facsimile
                       (Envelope enclosed)              (Envelope enclosed)
    ___ Other (Explain):

6.  **Date and Time of Receipt:** 8/28/2008 2:33:21 PM PST (GMT -8)

7.  **Appearance/Answer Date:** 20 Days

8.  **Received From:**
    (Name, Address & Telephone Number)  Alan R. Brill, Pro Per
                       420 NW Fifth Street
                       Evansville, IN 47708
                       (812) 423-6200

9.  **Federal Express Airbill #** 790075819727

10.  **Call Made to:** VM - MICHAEL E. CAHILL, ESQ.

11.  **Special Comments:**

NATIONAL REGISTERED AGENTS, INC.          Copies To:

SEP 0 2 2008

Transmitted by: Dena LaPorta

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

STATE OF INDIANA )
                 ) SS:    **VANDERBURGH SUPERIOR COURT**
COUNTY OF VANDERBURGH )

CAUSE NO. 82D03–0808–PL–04636

**SUMMONS**

Alan R. Brill et al

**PLAINTIFF**

**VS**

TCW Shared Opportunity Fund III L.P. Assigned to: DOUGLAS KNIGHT

**DEFENDANT**

VANDERBURGH SUPERIOR COURT

FILED (FILE STAMP)

AUG 2 1 2008

JUDGE J DOUGLAS

Susan K. Kirk
CLERK

**TO ABOVE NAMED DEFENDANT OF DEFENDANTS:**

You have been sued by the person(s) named "plaintiff", in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which the plaintiff has made and wants from you. You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgement may be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

The following manner of service of summons is hereby designated: _____

If not so designated, the clerk shall cause service to be made by mail.

Date _____

Susan K. Kirk

Attorney for Plaintiff __Alax R. Brr. ()__                                          Clerk

Address 420 NW 5#ST Evansville IN47708                    By _____ Deputy

Phone 812-423-6200                      (SEAL)

**CERTIFICATE OF MAILING**

I hereby certify that on the _____ day of _____, 20 ____, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 20 ____.                    _____ Clerk

                                                 By _____ Deputy

**RETURN OF SERVE OF SUMMONS BY MAIL**

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 20 ____, and that a copy of the return receipt was received on the _____ day of _____, 20 ____, which copy is attached herewith.

Dated _____, 20 ____.                     _____ Clerk

                                                  By _____ Deputy

**RETURN OF SERVICE OF SUMMONS BY SHERIFF**

I hereby certify that I have served the within summons:

1. By delivering personally on the _____ day of _____, 20 ____, a copy of the summons and a copy of the complaint to each of the within-named defendants.

2. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

3. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2, or 3., there shall be added:

That on the _____ day of _____, 20 ____, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendants.

Resident Agent / Chief Executive Officer        Sheriff of Vanderburgh County, Indiana
TCW Shared Opportunity Fund III, L.P.           By _____ Deputy
c/o Register Agent
National Registered Agents Inc
2030 Main Street Ste 1030
Irvine CA 92614

## NATIONAL REGISTERED AGENTS, INC.

### SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To: MICHAEL E. CAHILL, ESQ.
TRUST COMPANY OF THE WEST
865 S. FIGUEROA ST., SUITE 1800
LOS ANGELES, CA 90017-

SOP Transmittal # CA61046

(800) 767-1553 - Telephone
(609) 716-0820 - Fax

Entity Served: TCW INVESTMENT MANAGEMENT COMPANY

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of   CALIFORNIA   on this  28  day of   August   ,  2008  . The following is a summary of the document(s) received:

1.   Title of Action: Alan R. Brill, et al. v. Shared Opportunity Fund IIB LLC, et al.

2.   Document(s) served:

| | | |
|---|---|---|
| x Summons | __ Subpoena | __ Injunction |
| x Complaint | __ Third Party Complaint | __ Notice of |
| __ Petition | __ Demand for Jury Trial | __ Mechanics Lien |
| __ Garnishment | __ Default Judgment | __ Other: |

3.   Court of Jurisdiction/   Vanderburgh County Superior Court, State of Indiana
Case & Docket Number: 82D03-0808-PL-04636

4.   Amount Claimed, if any: Please See Attached

5.   Method of Service (select one):
__ Personally served by:   __ Process Server   __ Deputy Sheriff   __ U. S Marshall
x Delivered Via:   x Certified Mail   __ Regular Mail   __ Facsimile
                   (Envelope enclosed)   (Envelope enclosed)
__ Other (Explain):

6.   Date and Time of Receipt: 8/28/2008 2:35:24 PM PST (GMT -8)

7.   Appearance/Answer Date: 20 Days

8.   Received From:
(Name, Address & Telephone Number) Alan R. Brill, Pro Per
420 NW Fifth Street
Evansville, IN 47708
(812) 423-6200

9.   Federal Express Airbill # 790075819727

10. Call Made to: VM - MICHAEL E. CAHILL, ESQ.

11.   Special Comments:

NATIONAL REGISTERED AGENTS, INC.          Copies To:

Transmitted by: Dena LaPorta

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL                    SEP 0 2 2008

STATE OF INDIANA ) 
) SS: **VANDERBURGH SUPERIOR COURT**
COUNTY OF VANDERBURGH )

CAUSE NO. 82D03-0808-PL-04636

### SUMMONS

Alan R. Brill et al
_Assigned to: DOUGLAS KNIGHT_

**PLAINTIFF**

VS
TCW Investment Management Company
_JUDGE J DOUGLAS KNIGHT_

VANDERBURGH SUPERIOR COURT
(FILE STAMP)

AUG 21 2008

**DEFENDANT**

Susan K. Kirk
CLERK

**TO ABOVE NAMED DEFENDANT OF DEFENDANTS:**

You have been sued by the person(s) named "plaintiff", in the court stated above.
The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which the plaintiff has made and wants from you. You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgement may be entered against you for what the plaintiff has demanded.
If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.
The following manner of service of summons is hereby designated: _____
If not so designated, the clerk shall cause service to be made by mail.

Date 8/21/08

_Alan R. Br. 21_
**Attorney for Plaintiff**
Address 420 NW 5th St. Evansville, IN 47708
Phone 812-423-6200

Susan K. Kirk
_____ Clerk
_____ Deputy
(SEAL)

### CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 20 ____, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 20 ____.

_____ Clerk
By _____ Deputy

### RETURN OF SERVE OF SUMMONS BY MAIL

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 20 ____, and that a copy of the return receipt was received on the _____ day of _____, 20 ____, which copy is attached herewith.

Dated _____, 20 ____.

_____ Clerk
By _____ Deputy

### RETURN OF SERVICE OF SUMMONS BY SHERIFF

I hereby certify that I have served the within summons:

1. By delivering personally on the _____ day of _____, 20 ____, a copy of the summons and a copy of the complaint to each of the within-named defendants.

2. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

3. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2. or 3., there shall be added:

That on the _____ day of _____, 20 ____, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendants.

Resident Agent / Chief Executive Officer
TCW Investment Management Company
c/o Register Agent
National Registered Agents Inc
2030 Main Street Ste 1030
Irvine CA 92614

Sheriff of Vanderburgh County, Indiana
By _____ Deputy

## NATIONAL REGISTERED AGENTS, INC.

### SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To: MICHAEL E. CAHILL, ESQ.
TRUST COMPANY OF THE WEST
865 S. FIGUEROA ST., SUITE 1800
LOS ANGELES, CA 90017-

SOP Transmittal # CA61048

(800) 767-1553 - Telephone
(609) 716-0820 - Fax

Entity Served: TCW (SHOP III), L.P.

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of    CALIFORNIA    on this 28 day of    August    ,  2008  . The following is a summary of the document(s) received:

1. **Title of Action:** Alan R. Brill, et al. v. Shared Opportunity Fund IIB LLC, et al.

2. **Document(s) served:**

   | | | |
   |---|---|---|
   | X Summons | ___ Subpoena | ___ Injunction |
   | X Complaint | ___ Third Party Complaint | ___ Notice of |
   | ___ Petition | ___ Demand for Jury Trial | ___ Mechanics Lien |
   | ___ Garnishment | ___ Default Judgment | ___ Other: |

3. **Court of Jurisdiction/**    Vanderburgh County Superior Court, State of Indiana
   **Case & Docket Number:** 82D03-0808-PL-04636

4. **Amount Claimed, if any:** Please See Attached

5. **Method of Service** (select one):
   ___ Personally served by:    ___ Process Server    ___ Deputy Sheriff    ___ U. S Marshall-
   X Delivered Via:    X Certified Mail    ___ Regular Mail    ___ Facsimile
   (Envelope enclosed)    (Envelope enclosed)
   ___ Other (Explain):

6. **Date and Time of Receipt:** 8/28/2008 2:38:54 PM PST (GMT -8)

7. **Appearance/Answer Date:** 20 Days

8. **Received From:**
   (Name, Address & Telephone Number) Alan R. Brill, Pro Per
   420 NW Fifth Street
   Evansville, IN 47708
   (812) 423-6200

9. **Federal Express Airbill #** 790075819727

10. **Call Made to:** VM - MICHAEL E. CAHILL, ESQ.

11. **Special Comments:**

NATIONAL REGISTERED AGENTS, INC.    Copies To:    ¡SEP 0 2 2008

Transmitted by: Dena LaPorta

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion  It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

**STATE OF INDIANA** )
) SS: **VANDERBURGH SUPERIOR COURT**
**COUNTY OF VANDERBURGH** )

CAUSE NO. 82D03-0808-PL-04636

**SUMMONS**

Alan R. Brill et al

**PLAINTIFF**

Assigned to: DOUGLAS KNIGHT
JUDGE J

**VS**

VANDERBURGH SUPERIOR COURT

☆ FILED ☆

TCW (SHOP III) L.P.
**DEFENDANT**

AUG 2 1 2008

**TO ABOVE NAMED DEFENDANT OF DEFENDANTS:**

You have been sued by the person(s) named "plaintiff", in the court stated above.
The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which the plaintiff has made and wants from you. You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgement may be entered against you for what the plaintiff has demanded.
If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.
The following manner of service of summons is hereby designated: _____
If not so designated, the clerk shall cause service to be made by mail.

Date 8 21 08 _____ Alan B. Brill _____ Susan K. Kirk _____ Clerk
**Attorney for Plaintiff**
Address 420 NW 5th St. Evansville, IN 47708 By _____ Deputy
Phone 812-423-6200 (SEAL)

**CERTIFICATE OF MAILING**

I hereby certify that on the _____ day of _____, 20 ____, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.
Dated _____, 20 ____. _____ Clerk
By _____ Deputy

**RETURN OF SERVE OF SUMMONS BY MAIL**

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 20 ____, and that a copy of the return receipt was received on the _____ day of _____, 20 ____, which copy is attached herewith.
Dated _____, 20 ____. _____ Clerk
By _____ Deputy

**RETURN OF SERVICE OF SUMMONS BY SHERIFF**

I hereby certify that I have served the within summons:
1. By delivering personally on the _____ day of _____, 20 ____, a copy of the summons and a copy of the complaint to each of the within-named defendants.
2. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.
3. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.
Whenever service is made on part 2. or 3., there shall be added:
That on the _____ day of _____, 20 ____, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendants.

Sheriff of Vanderburgh County, Indiana
By _____ Deputy

(NAME AND ADDRESS)
C/O Registered Agent
National Registered Agents. Inc.
2030 Main Street Suite 1030
Irvine, CA. 92614

Form S-1 B-W

17

## NATIONAL REGISTERED AGENTS, INC.

### SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  MICHAEL E. CAHILL, ESQ.
TRUST COMPANY OF THE WEST
865 S. FIGUEROA ST., SUITE 1800
LOS ANGELES, CA 90017-

SOP Transmittal # CA61049

(800) 767-1553 - Telephone
(609) 716-0820 - Fax

Entity Served: TCW ASSET MANAGEMENT COMPANY

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of    CALIFORNIA    on this  28  day of    August    ,  2008 . The following is a summary of the document(s) received:

1.  **Title of Action:** Alan R. Brill, et al. v. Shared Opportunity Fund IIB LLC, et al.

2.  **Document(s) served:**

    X  Summons            __ Subpoena                __ Injunction
    X  Complaint          __ Third Party Complaint   __ Notice of
    __ Petition           __ Demand for Jury Trial   __ Mechanics Lien
    __ Garnishment        __ Default Judgment        __ Other:

3.  **Court of Jurisdiction/**    Vanderburgh County Superior Court, State of Indiana
    **Case & Docket Number:** 82D03-0808-PL-04636

4.  **Amount Claimed, if any:** Please See Attached

5.  **Method of Service** (select one):
    __ Personally served by:   __ Process Server      __ Deputy Sheriff     __ U. S Marshall
    X  Delivered Via:          X  Certified Mail      __ Regular Mail       __ Facsimile
                                  (Envelope enclosed)     (Envelope enclosed)

    __ Other (Explain):

6.  **Date and Time of Receipt:** 8/28/2008 2:39:09 PM PST (GMT -8)

7.  **Appearance/Answer Date:** 20 Days

8.  **Received From:**                          9.  Federal Express Airbill # 790075819727
    (Name, Address & Telephone Number)  Alan R. Brill, Pro Per
                          420 NW Fifth Street      10. Call Made to: VM - MICHAEL E. CAHILL, ESQ.
                          Evansville, IN 47708
                          (812) 423-6200

11.  **Special Comments:**

NATIONAL REGISTERED AGENTS, INC.          Copies To:

SEP 0 2 2008

Transmitted by: Dena LaPorta

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

| STATE OF INDIANA | ) | | VANDERBURGH SUPERIOR COURT |
| | ) SS: | | |
| COUNTY OF VANDERBURGH | ) | | CAUSE NO. 82D03-0808-PL-04636 |

## SUMMONS

Alan R. Brill et al
_____
**PLAINTIFF**

VS

TCW Asset Management Company
_____
**DEFENDANT**

Assigned to:
JUDGE J. DOUGLAS KNIGHT

VANDERBURGH SUPERIOR COURT
FILED
(FILE STAMP)

AUG 2 1 2008

Susan K. Kirk
CLERK

### TO ABOVE NAMED DEFENDANT OF DEFENDANTS:

You have been sued by the person(s) named "plaintiff," in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which the plaintiff has made and wants from you. You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgement may be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

The following manner of service of summons is hereby designated: _____

If not so designated, the clerk shall cause service to be made by mail.

Date 8/21/08

Plaintiff Brill   /s/ Alan R. Br.'ll
**Attorney for Plaintiff**
Address 420 NW 5th ST, Evansville, IN 47708
Phone 812-425-6266

Susan K. Kirk _____ Clerk

By _____ Deputy
(SEAL)

### CERTIFICATE OF MAILING

I hereby certify that on the _____ day of _____, 20 _____, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 20 _____.

_____ Clerk

By _____ Deputy

### RETURN OF SERVE OF SUMMONS BY MAIL

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 20 _____, and that a copy of the return receipt was received on the _____ day of _____, 20 _____, which copy is attached herewith.

Dated _____, 20 _____.

_____ Clerk

By _____ Deputy

### RETURN OF SERVICE OF SUMMONS BY SHERIFF

I hereby certify that I have served the within summons:

1. By delivering personally on the _____ day of _____, 20 _____, a copy of the summons and a copy of the complaint to each of the within-named defendants.

2. By leaving on the _____ day of _____, 20 _____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

3. By leaving on the _____ day of _____, 20 _____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2, or 3., there shall be added:

That on the _____ day of _____, 20 _____, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendants.

**Resident Agent / Chief Executive Officer**
**TCW Asset Management Company**
c/o Register Agent
National Registered Agents Inc
2030 Main Street Ste 1030
Irvine CA 92614

Sheriff of Vanderburgh County, Indiana

By _____ Deputy

Form S-1 B-W   2 1

## NATIONAL REGISTERED AGENTS, INC.

### SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To: MICHAEL E. CAHILL, ESQ.
TRUST COMPANY OF THE WEST
865 S. FIGUEROA ST., SUITE 1800
LOS ANGELES, CA 90017-

SOP Transmittal # CA61047

(800) 767-1553 – Telephone
(609) 716-0820 – Fax

Entity Served: SHARED OPPORTUNITY FUND IIB LLC

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of     CALIFORNIA     on this  28  day of     August     ,  2008  . The following is a summary of the document(s) received:

1.   Title of Action: Alan R. Brill, et al. v. Shared Opportunity Fund IIB LLC, et al.

2.   Document(s) served:

| | | |
|---|---|---|
| x Summons | __ Subpoena | __ Injunction |
| x Complaint | __ Third Party Complaint | __ Notice of |
| __ Petition | __ Demand for Jury Trial | __ Mechanics Lien |
| __ Garnishment | __ Default Judgment | __ Other: |

3.   Court of Jurisdiction/     Vanderburgh County Superior Court, State of Indiana
     Case & Docket Number: 82D03-0808-PL-04636

4.   Amount Claimed, if any: Please See Attached

5.   Method of Service (select one):
     __ Personally served by:   __ Process Server        __ Deputy Sheriff        __ U. S Marshall
     x Delivered Via:   x Certified Mail        __ Regular Mail        __ Facsimile
                        (Envelope enclosed)        (Envelope enclosed)

     __ Other (Explain):

6.   Date and Time of Receipt: 8/28/2008 2:36:56 PM PST (GMT -8)

7.   Appearance/Answer Date: 20 Days

8.   Received From:
     (Name, Address & Telephone Number)  Alan R. Brill, Pro Per
                                         420 NW Fifth Street
                                         Evansville, IN 47708
                                         (812) 423-6200

9.   Federal Express Airbill # 790075819727

10.  Call Made to: VM – MICHAEL E. CAHILL, ESQ.

11.  Special Comments:

NATIONAL REGISTERED AGENTS, INC.          Copies To:          ¡SEP 0 2 2008

Transmitted by: Dena LaPorta

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

STATE OF INDIANA       )

                  ) SS:     **VANDERBURGH SUPERIOR COURT**

COUNTY OF VANDERBURGH    )

                               **CAUSE NO.** 82D03-0808-PL-04636

**SUMMONS**

Alan R. Brill et al                VANDERBURGH SUPERIOR COURT

**PLAINTIFF**                    Assigned to:    KNIGHT LEE

      VS                 JUDGE J DOUGLAS   **(FILE STAMP)**

Shared Opportunity Fund IIB L.L.C.         AUG 2 1 2008

**DEFENDANT**

                                          CLERK

**TO ABOVE NAMED DEFENDANT OF DEFENDANTS:**

You have been sued by the person(s) named "plaintiff", in the court stated above.

The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which the plaintiff has made and wants from you. You must answer the complaint in writing, by you or your attorney, within twenty (20) days, commencing the day after you receive this summons, or judgement may be entered against you for what the plaintiff has demanded.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

The following manner of service of summons is hereby designated: _____

If not so designated, the clerk shall cause service to be made by mail.

Date 8/21/08

_Alan R. Brill_                 _Susan K. Kirk_

**Attorney for Plaintiff**                                    Clerk

**Address** 420 NW 5th St, Evansville, IN 47708    By _____

**Phone** 812-473-6200                       (SEAL)     Deputy

**CERTIFICATE OF MAILING**

I hereby certify that on the _____ day of _____, 20 ____, I mailed a copy of this summons and a copy of the complaint to each of the defendant(s) by (registered or certified) mail, requesting a return receipt signed by the addressee only, addressed to each of said defendant(s), at the addresses furnished by the plaintiff.

Dated _____, 20 ____.                 _____ Clerk

                                        By _____ Deputy

**RETURN OF SERVE OF SUMMONS BY MAIL**

I hereby certify that service of summons with return receipt requested was mailed on the _____ day of _____, 20 ____, and that a copy of the return receipt was received on the _____ day of _____, 20 ____, which copy is attached herewith.

Dated _____, 20 ____.                 _____ Clerk

                                         By _____ Deputy

**RETURN OF SERVICE OF SUMMONS BY SHERIFF**

I hereby certify that I have served the within summons:

     1. By delivering personally on the _____ day of _____, 20 ____, a copy of the summons and a copy of the complaint to each of the within-named defendants.

     2. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective dwelling place of abode with some person of suitable age and discretion whose duties or activities include prompt communication of such information to the person being served.

     3. By leaving on the _____ day of _____, 20 ____, for each of the within-named defendants a copy of the summons and a copy of the complaint at the respective or usual place of business or employment with some person of suitable age and discretion whose usual duties or activities include prompt communication of such information to the person being served.

Whenever service is made on part 2. or 3., there shall be added:

     That on the _____ day of _____, 20 ____, I sent by first-class mail a copy of the summons without the complaint to each of the within-named defendants.

Resident Agent / Chief Executive Officer        Sheriff of Vanderburgh County, Indiana

Shared Opportunity Fund IIB LLC             By _____ Deputy

c/o Register Agent

National Registered Agents Inc

2030 Main Street Ste 1030

Irvine CA 92614